## STATE v. MELVIN LEO BRYANT.

177 N. W. (2d) 800.

May 22, 1970—No. 41672.

*Robins, Meshbesher, Singer & Spence, Ronald I. Meshbesher,* and *Morley Friedman,* for appellant.

*Douglas M. Head,* Attorney General, *William B. Randall,* County Attorney, *Steven B. DeCoster* and *Daniel Hollihan,* Assistant County Attorneys, and *Mentor C. Addicks, Jr.,* Special Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

This is an appeal from a judgment convicting defendant of consensual sodomy. The facts are not seriously in dispute and therefore only those necessary to the resolution of the issue raised will be presented.

Montgomery Ward and Company operates a large department store in St. Paul. For the convenience of the public it provides restrooms. The men's restroom involved here contained a number of toilet stalls, 2 feet 9 inches wide and approximately 5 feet in depth. They were separated by metal partitions beginning about 12 1/2 inches above the floor and extending to within 3 1/2 feet from the ceiling. The partitions were constructed of two pieces

of metal back-to-back with an air space between them. The total thickness of the partitions was about 1 inch. Each stall had a door which could be closed and secured from the inside. When the door was closed it was impossible to see into the stall from the public area of the restroom, other than to see the feet of one occupying the stall. A hole about 2 1/2 inches in diameter had been cut through the partition separating two stalls. The hole was known to the store's protection supervisor, David Imire, and had existed for about 2 weeks before the matters discussed herein took place. Mr. Imire brought it to the attention of the store's operating manager, but the hole was not closed and was still in existence at the time of the trial. Suspecting that the stalls were being illegally used by homosexuals, the store's protection manager enlisted the aid of the St. Paul police. A police officer and Mr. Imire stationed themselves over a ventilator in the ceiling above the restroom, which enabled them to view the toilet stalls below. There they observed defendant and another perform an act of oral sodomy by means of the hole cut in the partition separating the two stalls. Defendant was thereupon arrested, tried, and convicted upon the testimony of the police officer and Mr. Imire. If the testimony upon which the conviction rests was admissible, there is no doubt that there is sufficient evidence to sustain the conviction. The only question raised here is whether the testimony of the police officer and Imire was admissible.

The facts in this case are indistinguishable from those of Bielicki v. Superior Court, 57 Cal. (2d) 602, 21 Cal. Rptr. 552, 371 P. (2d) 288, and Britt v. Superior Court, 58 Cal. (2d) 469, 24 Cal. Rptr. 849, 374 P. (2d) 817.

The Bielicki case held that testimony of officers who secretly observed occupants of toilet stalls through a pipe installed through the roof of the building was inadmissible as the product of an unlawful search. The court said (57 Cal. [2d] 609, 21 Cal. Rptr. 556, 371 P. [2d] 292):

"Certainly the premises of an amusement park held out to public use are subject to reasonable inspection. But license to make such an inspection of a toilet stall is not the equivalent of authority to invade the personal right of privacy of the person occupying the stall. Authority of police officers to spy on occupants of toilet booths—whether in an amusement park or a private home—will not be sustained on the theory that if they watch enough people long enough some malum prohibitum acts will eventually be discovered."

In the Britt case, an officer secretly watched toilet stalls in a department store by means of two vents. Defendant was apprehended, as here, in committing an illegal act. In holding the testimony of an officer was inadmissible, the court said (58 Cal. [2d] 472, 24 Cal. Rptr. 851, 374 P. [2d] 819):

"* * * Of course, clandestine observations by police officers of premises devoted to common use by the general public—such as, for example, the shopping areas and public hallways and elevators of the department store here involved—is not prohibited by our decision in Bielicki. * * * But it is equally clear that authority to maintain clandestine surveillance of common use public places and persons therein is not the equivalent of license to surreptitiously invade the right of personal privacy of persons in private places. Man's constitutionally protected right of personal privacy not only abides with him while he is the householder within his own castle but cloaks him when as a member of the public he is temporarily occupying a room—including a toilet stall—to the extent that it is offered to the public for private, however transient, individual use."

In Brown v. State, 3 Md. App. 90, 238 A. (2d) 147, an officer observed a known drug addict standing in a toilet booth. There was a swinging door about 5 feet 5 inches high on the booth. The officer put his head over the door and saw some narcotic paraphernalia on the commode. The court, holding his testimony inadmissible, said (3 Md. App. 94, 238 A. [2d] 149):

"* * * We believe that a person who enters an enclosed stall in a public toilet, with the door closed behind him, is entitled, at least, to the modicum of privacy its design affords, certainly to the extent that he will not be joined by an uninvited guest or spied upon by probing eyes in a head physically intruding into the area."

In State v. Kent, 20 Utah (2d) 1, 432 P. (2d) 64, police suspected the defendant of stealing narcotics. They obtained permission from a motel manager to observe the bathroom and part of the bedroom through a ventilator in the attic. The court held the evidence obtained inadmissible since it was the result of an illegal exploratory search which violated defendant's constitutional right to privacy.

The only case which our research has brought to light where observation of a toilet stall, such as is involved here, was held to be admissible, is Smayda v. United States (9 Cir.) 352 F. (2d) 251, certiorari denied, 382 U. S. 981, 86 S. Ct. 555, 15 L. ed. (2d) 471. The decision was by a divided court. The court said (352 F. [2d] 255):

"* * * [I]t would have been easy for any member of the public to see the offense. Any member of the public could have peered over the door, or the side partitions, or under either, or pushed open the door. * * * 'If appellant[s] had any right of privacy [they] certainly waived it' * * *."

A number of cases have held that where there is no door on the stall or the one using it has no right to expect privacy, evidence is admissible showing the commission of a similar crime. See, for example, People v. Heath, 266 Cal. App. (2d) 754, 72 Cal. Rptr. 457; People v. Roberts, 256 Cal. App. (2d) 488, 64 Cal. Rptr. 70; People v. Maldonado, 240 Cal. App. (2d) 812, 50 Cal. Rptr. 45; People v. Hensel, 233 Cal. App. (2d) 834, 43 Cal. Rptr. 865; People v. Young, 214 Cal. App. (2d) 131, 29 Cal. Rptr. 492; People v. Norton, 209 Cal. App. (2d) 173, 25 Cal. Rptr. 676;

Poore v. State of Ohio (N. D. Ohio) 243 F. Supp. 777; State v. Coyle (Fla. App.) 181 So. (2d) 671.

We view as controlling the case of Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L. ed. (2d) 576. There the defendant was convicted of transmitting wagering information by telephone. FBI agents had attached an electronic listening and recording device to the outside of a public telephone booth from which the defendant placed his calls. In holding that the evidence was inadmissible, the Supreme Court said (389 U. S. 351, 88 S. Ct. 511, 19 L. ed. [2d] 582):

"* * * For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations omitted.]

"The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. * * *

* * * * *

"* * * The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the

Fourth Amendment. The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance."

While the Katz case involved evidence obtained by listening and the case before us involves evidence obtained by visual observation, we think the results are the same. In a concurring opinion, Mr. Justice Harlan said (389 U. S. 361, 88 S. Ct. 516, 19 L. ed. [2d] 587):

"As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. [Citation omitted.]

"The critical fact in these cases is that '[o]ne who occupies it, [a telephone booth] shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume' that his conversation is not being intercepted. * * * The point is not that the booth is 'accessible to the public' at other times * * * but that it is a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable."

Surely this language applies here, where the facilities pro-

vided assure the user of privacy as much as a telephone booth does.

It is understandable that a large department store would desire to eliminate a use of restrooms that would be revolting to most people who wished to use the facilities properly. There were, however, ways of eliminating such use of the facilities other than surreptitious surveillance. The store had known about the hole in the partition for some time before defendant was apprehended, but had not closed it. The store could have removed the doors if it saw fit, so that anyone using the facilities would have no expectation of privacy; or it could have posted signs warning anyone using the facilities that they were apt to be under surveillance. But once facilities are provided wherein those using them properly are assured of privacy, the store has no right to destroy that privacy without the consent, actual or implied, of one to whom it has been assured. In the very nature of things, in the process of protecting the innocent all search and seizure prohibitions inevitably afford protection to some guilty persons; but the rights of the innocent may not be sacrificed to apprehend the guilty.

We think that those using the facilities provided by the store in a proper manner would have been quite shocked to know that they were under surveillance. We are convinced that the evidence obtained in this manner is inadmissible.

The state relies mainly on consent to support admissibility of the evidence obtained. As far as the user of the facilities is concerned, there was, of course, no consent. Consent can hardly be given in the absence of some knowledge that an act is in progress or is to be performed. In the state's brief we find the following:

*"The search was lawful because consent to the search was given by the management of the department store to the police to assume a physical vantage point which is on property over which customers have no control and which is beyond the confines of the areas of the exclusive control of persons using men's room facilities.*

"Certainly the management of the department [store] has standing to consent to allowing a police officer to take a position anywhere in the store which is not within that area ostensibly under the defendant's exclusive control."

With that position we cannot agree. As has been stated above, once the store provided facilities of such a nature that the user was assured of privacy, it could not destroy that privacy by giving its consent to secret surveillance by police.

We are of the opinion that the evidence obtained by this secret surveillance was a violation of the constitutional rights of those using the facilities provided by the store. As a consequence the evidence was inadmissible and the conviction must be reversed.

Reversed.

SHERAN, JUSTICE (dissenting).

The implicit premise of the majority opinion is that the right of privacy of persons who use toilet facilities provided by a place of business is offended by a surveillance of the kind here involved and, this being the case, evidence obtained with respect to illegal activities by persons using these facilities for improper purposes should not be received in court lest such distasteful procedures be encouraged by acceptance of their evidentiary product.

I disagree only because, in my view, persons who use places of this kind for illegal activities which subvert the object of the owner's invitation should not be allowed to shield their perversions by appealing to the court's proper concern for the rights of others not involved in the prosecution.

MURPHY, JUSTICE (dissenting).

I agree with the views expressed in the dissenting opinion of Mr. Justice Sheran.

OTIS, JUSTICE (dissenting).

It is with some hesitation I join in the dissent of Mr. Justice Sheran because it is undeniable that the privacy of innocent persons has here been invaded.

Nevertheless, the authorities were confronted with a difficult

problem which they had a duty to correct in order to prevent legitimate customers and their children from being exposed to defendant's revolting deviant behavior.

Since it would never be possible to secure a search warrant in situations of this kind, I am of the opinion this surveillance for a limited time and purpose was reasonable and did not violate the Fourth Amendment. The alternative proposals suggested by the majority are not, in my opinion, realistic solutions.