UNITED STATES of America

v.

Harold WRIGHT, Appellant.

No. 23060.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 18, 1971.

Decided April 19, 1971.

Petition for Rehearing and Suggestion
for Rehearing En Banc Denied
Oct. 8, 1971.

Mr. David W. Miller, Washington, D. C., with whom Mr. Richard M. Sharp, Washington, D. C. (both appointed by this Court), was on the brief, for appellant.

Mr. Herbert B. Hoffman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

PER CURIAM:

Appellant was convicted of grand larceny [1] of a Chevrolet Corvette transmission, found by police in appellant's garage immediately before and at the time of his arrest. After an evidentiary hearing, appellant's pretrial motion to suppress the transmission as evidence because of a violation of the Fourth Amendment by an alleged illegal search and seizure was denied. The sole issue on this appeal is the legality of the seizure in appellant's garage of the stolen transmission and its introduction in evidence. We affirm.

I.  *Facts Relevant to the Issue Presented*

All the events took place on 18 May 1968, beginning at 5:00 a. m. when the police were notified that a 1967 Chevrolet Corvette had been stolen. By 4:20 p. m. Police Officers Huffstutler and Howard had located the Corvette, stripped of its transmission, engine, radiator, hood and steering wheel. From various pieces of evidence in and around the car Officer Huffstutler concluded that the Corvette had been stripped elsewhere, and by an examination of the terrain deduced the probable locale of the stripping within a three-block area. In a systematic survey of all streets and alleys they observed tell-tale sweepings of nuts and bolts in front of a three-car garage, and in addition several red rags of the type previously noted on the stripped Corvette. A comparison of the rags found at the two locations showed they were identical. The officers returned to the garage.

The three sliding doors of the garage were not completely closed because of their construction and age, leaving an opening of approximately eight or nine inches. Inside it was "relatively dark," so the officer employed his flashlight to look in through the gap. Lying ten feet away he noticed a transmission shaft. On his knees for a better view, he identified it as a Chevrolet product, and observed that the speedometer cable had been clipped. After returning to the stripped Corvette, a check of its speedometer cable showed it, too, had been clipped.

On notifying the Auto Squad of his discoveries, Officer Huffstutler was advised to go to the garage and recover the stolen transmission. Instead, he returned to his precinct and began to type an application for a search warrant. On reflection, he decided it was better then to return to the garage, interview its owner, and set in motion the procedure to take fingerprints from the Corvette. [2]

On arrival at the garage Officer Huffstutler and his partner noted an automobile with its trunk open, parked so the trunk could be loaded from a little alleyway which led to the side door of the garage. Inside the open trunk were a steering wheel, clutch plate, and pressure plate, all 1967 Corvette equipment, and each of which corresponded to items stripped from the stolen car. With guns drawn the officers moved toward the open side door of the garage, and as they did appellant Wright and two others emerged. The three were arrested for possession of stolen property. Leaving them in custody, Officer Huffstutler entered the open door of the garage and located the Corvette transmission which had been moved to another place inside.

On the basis of these operative facts appellant contended in the trial court and here alleges that two searches and the resulting seizure were illegal; the first alleged illegal search being when Officer Huffstutler, with his vision aided by the flashlight, peered through the opening between the garage doors; the second being when he walked in through the open door to pick up the stolen auto-

---

1.  22 D.C.Code § 2201. Appellant was placed on probation for a period of three years.

2.  The latent prints taken from the Corvette were identified as those belonging

to appellant. He explained their presence by claiming that the owner had brought the Corvette into the service station where appellant worked. The owner testified that he had patronized that service station, but never with his Corvette.

mobile transmission, which he had first seen in the garage less than two hours before.

## II. *Legality of the Officer's First Look*

Appellant contends strenuously that his rights under the Fourth Amendment[3] were violated not once but twice by illegal search of the garage. He argues that the officer's action in peering through the eight or nine-inch crack was a search, particularly since it was aided by artificial light; that such search was illegal; that this illegal search tainted the seizure thereafter of the auto transmission at the time of the arrest. As in Dorsey v. United States,[4] "the Government argues there can be no question of an illegal search since there was no search at all."

There was no search here. There are at least two doctrines or perhaps two different characterizations of the same doctrine, which we have enunciated in previous decisions on which the officer's conduct was legally justified. For convenience they might be termed the "challenging situation" and "plain view" doctrines.

### A. *A closer look at a challenging situation.*

In *Dorsey, supra,* two officers approached a parked car occupied by two recognized, known narcotics violators. Although it was 11:00 p. m. the officers could see the driver and the passenger were turned facing each other as though examining something on the seat. The officer on the driver's side directed his flashlight into the car and illuminated in Dorsey's hand a cellophane bag filled with white-powdered, gelatin capsules. When Dorsey placed the bag on the ledge of the glove compartment, the other officer reached through the open window, seized the bag, and placed Dorsey under arrest. As the driver complained of the officer flashing his light inside the car, the officer noticed that the driver was dropping heroin capsules on the floor. He, too, was arrested and nine heroin capsules were picked up off the floor.

Without either characterizing the officer's action as a search or attempting to justify it as a search, we held that

The essential inquiry, as is customarily the case in Fourth Amendment claims, is the reasonableness of the police conduct under the circumstances. * * * Reasonableness involves consideration of the nature of the police conduct as well as the occasion of its exercise. We think the evidence supported a view of that conduct as not transgressing the constitutional standard.

* * * When the officers suddenly saw [the appellants] situated as they were at the time and place in question, the former were entitled to extend their preventive patrolling mission to the extent of approaching the car and observing what was going on inside. * * * We do not think the need to employ a visual aid at night in the form of a flashlight converts this from lawful into unlawful conduct. A car parked at 14th and U Streets at eleven o'clock at night, occupied by known narcotics offenders, bears little resemblance to a home or dwelling. If policemen are to serve any purpose of detecting and preventing crime by being out on the streets at all, *they must be able to take a closer look at challenging situations as they encounter them.* All we hold here is that this was one of those situations, and that the police response to it was a justifiable one which did not project their law enforcement responsibilities

3.  Amendment IV (1791) :

    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but on probable cause, supported by Oath ·or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

4.  125 U.S.App.D.C. 355, 372 F.2d 928 (1967).

beyond permissible constitutional limits.[5]

We think the facts and holding in *Dorsey, supra,* are comparable and decisive of appellant's contentions in regard to his first alleged illegal search.[6]

### B. *Plain view.*

James v. United States[7] is equally dispositive of appellant's first claim and is closer on the operative facts. In *James* a police officer observed a partially stripped-down new Pontiac, and three days later observed that the stripping job had been completed. When he saw the new Pontiac the second time, completely stripped, the police officer entered the premises to investigate further, and in so doing secured the license number from the rear tag, the front license plate being missing.

On a pre-trial motion to suppress the District Court did exclude the rear license plate and the owner's manual found through the officer's entry on the unoccupied garage premises, but appellant also contended that all the stolen property discovered pursuant to a later issued search warrant should be suppressed, because this was the fruit of illegal observations by the officer from outside the garage which preceded his entry on the premises, and those observations violated his Fourth Amendment rights. The garage door was ajar and the officer was able to look under and observe parts and tools thrown about. In *James* we held that

> The police are free to observe circumstances in evidence that are in "plain view" to the public * * * the plain view doctrine was reaffirmed in Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). That the policeman may have to crane his neck, or bend over, or squat, does not render the doctrine inapplicable, so long as what he saw would have been visible to any curious passerby.[8]

Quite contrary to what the dissent argues, in *James on appeal* before this court there was no issue whatsoever as to the evidence (license number and owner's manual) already suppressed by the District Court. The issue on appeal concerned the validity of the warrant and the search made pursuant thereto, because "[w]hen an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue."[9] In *James* we held that the officer's observations, described above, "prior to his illegal entry, established probable cause for issuance of the warrant."[10] In *James* the two items of evidence, held illegally seized by the trial court, were never in the officer's plain view and were never argued on appeal to be admissible, the only question was did their

---

5. *Id.,* at 358, *id.,* at 931. (Emphasis supplied.)

6. It makes no difference that we are here involved with the illumination by flashlight of a garage, rather than a car. This is not a circumstance where the garage is either attached or adjacent to a dwelling so that it could be argued to have absorbed by some form of legal osmosis the special Fourth Amendment protections afforded a dwelling. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Here we are dealing with a three-car rented garage facing onto an alley. And clearly, even if the

record in this case unequivocally showed —which it does not—that what Officer Huffstutler saw when he beamed his flashlight through the crack in the doors could only have been otherwise observed if the light in the garage had been turned on, his conduct was still eminently reasonable under the Fourth Amendment. Petteway v. United States, 261 F.2d 53, 54 (4th Cir. 1958); United States v. Callahan, 256 F.Supp. 739, 745 (D.Minn.1964).

7. 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969).

8. *Id.,* at n. 7.

9. *Id.*

10. *Id.,* at 316, *id.,* at 1152.

seizure prior to the warrant taint the probable cause behind the warrant; hence, this court never decided any difference as to admissibility, "crucial" or otherwise, between the items legally and illegally seized. This court affirmed the legality of the officer's viewing from outside the garage as the basis for a warrant. The parallel between *James* and this case is that the officer's viewing was held legal, and here the officer saw much more than in *James*, i. e., the stolen transmission which he could positively identify as stolen, before he entered the garage. The legality of his entry and seizure without a warrant was thus justified under the plain view doctrine, while in *James* what the officer saw (no stolen property positively identified) was held to justify a warrant. In both cases it was the legality of the view from outside the garage to justify the officer's subsequent action which was put in issue.

We had occasion to discuss the "plain view" doctrine at some length in United States v. Thweatt.[11] There we reaffirmed out previous holding in Creighton v. United States,[12] where we stated, "We have long since pointed out that mere observation does not constitute a search, as where the officer has good reason to believe that the fruits of crime are freely exposed on the suspect's property."[13]

Although the Supreme Court last Term in Chimel v. California[14] overruled its broader holdings on search and seizure, the Court made it evident that the "plain view" doctrine was not abrogated. In our *en banc* decision in Dorman v. United States[15] and in United States v. Harris,[16] we applied the "plain view" doctrine subsequent to the Supreme Court decision in Chimel v. California.[17] Before *Chimel* the Supreme Court had affirmed our *en banc* decision in Harris v. United States,[18] and in so doing the Supreme Court said:

> It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. Ker v. California, 374 U.S. [23, 42–43, 83 S.Ct. 1623, 1634, 1635, 10 L.Ed.2d 726 (1963); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202]; Hester v. United States, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (1924).[19]

█ Whether it be considered that the transmission was in "plain view" to start with, or whether the officer took "a closer look at a challenging situation," we conclude that no rights of appellant protected by the Fourth Amendment were violated by Officer Huffstutler peering through the gap between the garage doors.

### III. *Legality of the Seizure of the Transmission in the Garage*

Appellant contends with equal vigor that the seizure of the auto transmission was illegal as being the product of an illegal search either if the entry of Officer Huffstutler into the garage is considered independently, or if his entry is considered as the product of his previously illegal search by peering through the gap in the garage doors. Appellant claims there could be no valid search incident to arrest, citing *Chimel, supra,* and Vale v. Louisiana.[20]

11. 140 U.S.App.D.C. 120, 433 F.2d 1226 (1970).

12. 132 U.S.App.D.C. 115, 406 F.2d 651 (1968).

13. *Id.*, at 116, *id.*, at 652.

14. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969).

15. 140 U.S.App.D.C. 313, 435 F.2d 385 (1970).

16. 140 U.S.App.D.C., 270, 280, 435 F.2d 74, 84 (1970).

17. Note 14, *supra.*

18. 125 U.S.App.D.C. 231, 370 F.2d 477 (1966).

19. 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968).

20. 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed. 2d 409 (1970).

Without making an elaborate comparison with *Chimel* or at this point with *Vale,* but noting that both those cases involved a dwelling where the protection of the Fourth Amendment is reasonably more extensive than in an open field, auto or a garage, we think that the action of the police officer can be justified as reasonable under the Fourth Amendment on either or both of two grounds.

A. *Plain view.*

All the authorities cited above in our discussion of the doctrine of "plain view" are equally applicable to Officer Huffstutler's seizure of the auto transmission. Obviously the doctrine of "plain view" would be a rather sterile doctrine if it extended only so far as police officers' looking. In all of the "plain view" cases, the viewing has been followed by a seizure of evidence.

We do not ignore that Officer Huffstutler had spotted the stolen auto transmission within ten feet of him, had noted the cut speedometer cable, had gone the few blocks to the stripped Corvette to see if its speedometer cable was cut (it was), then returned to the garage for a final look before going to his precinct. After a short time there he returned to the garage, made the arrests, and seized the auto transmission. All of the events from the time the two officers first came upon the stripped Corvette, searched the neighborhood, made their observations in the garage, went back to the stripped Corvette, went back to the garage, went to the precinct, returned to the garage for the third time—all took place in exactly two hours. The time interval from when Officer Huffstutler first spotted the stolen transmission is not certain, but it probably was more than an hour and not more than an hour and a half.

What appellant is contending for here is to write into the doctrine of "plain view" a continuous observation requirement. Is the officer required to keep his eye glued to the knothole while he motions for help with a free hand? If the officer had known the additional fact of the Corvette's speedometer cable being cut at the time he first saw the transmission, and had left his point of observation to return to his car to radio his headquarters, and then returned to the gap in the garage doors only to find the transmission had been moved out of his vision, would he then have been barred from moving inside the garage to seize what he was certain was stolen property? If an interruption of the officer's plain view of stolen property is allowed, how long an interruption is permitted?

In *Creighton, supra,* the police had observed various items of property openly displayed in appellant's car, after he had been arrested for a traffic violation. Learning of a burglary later while appellant was still at the station house, police went to appellant's car and seized the stolen property. We held that the goods were in plain view, and that there was no search, hence no warrant was required. In *Creighton,* as in the case at bar, the original "plain view" of the stolen property by the officers occurred at a time when the officers did not *know* the items were stolen.[21] In *Creighton* there was an interval after the sighting, during which a phone call turned up a report of a burglary; in *Wright* here there was an interval after the officer's first look, during which he checked the cut speedometer cable. In each case, after the clinching piece of information had been secured, the officer returned to the stolen property and seized it. No search was involved in either case.

21. There is no distinction to be made because when Officer Huffstutler made his observations in this case his suspicions were aroused to a greater degree than those of the officers in *Creighton.* For almost fifty years the Supreme Court has characterized observations made by officers acting under a great degree of suspicion as "plain view" observations not constituting illegal searches. *See* the characterization of the observations made in Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) as "plain view" in Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

■ In the circumstances of this case we believe that on the doctrine of "plain view" Officer Huffstutler was authorized to carry that doctrine to its logical conclusion, seize the stolen property he had observed, and that the one-hour to hour-and-a-half interval in which the other events connected with his investigation transpired did not preclude him from doing this. On his return to the garage at the time the arrests were made it was the officer's duty to follow up, see if the transmission was still there, and recover the stolen property if he could. Whether he could see the transmission through the open door is in our judgment immaterial. He had seen it in the garage no more than an hour and a half before; it was not an unreasonable seizure under the Fourth Amendment for him to step inside, identify it again, and have it moved out along with the other stolen automobile parts that were already in the process of being spirited away.

Our holding on this point finds support in the American Law Institute Tentative Draft No. 3 of A Model Code of Pre-Arraignment Procedure (1970), Part II, Search and Seizure. Section 6.06, Seizure Independent of Search, provides:

An officer who, in the course of otherwise lawful activity, observes or otherwise becomes aware of the nature and location of things which he reasonably believes to be subject to seizure under Section SS 1.03, and which therefore can be seized without a search, may seize such things.

Section SS 1.03(b) lists as subject to search and seizure "contraband, the fruits of crime, or things otherwise criminally possessed."

It was not necessary for Officer Huffstutler to make a search to discover the auto transmission when he seized it at the time of the arrest. He had already observed the transmission and become aware that it was located inside the garage. He had carefully checked it to be the fruit of the crime he was investigating and, in the language of the Amer-

ican Law Institute draft, it was "subject to seizure (as fruits of crime) * * * and * * * therefore can be seized without a search." [22]

The Commentary on this draft Section is illuminating:

The authorization with respect to the seizure of things plainly observable in private premises does raise some questions under Johnson v. United States, 333 U.S. 10 [68 S.Ct. 367, 92 L.Ed. 436] (1948). There the opium was not visible, but it was plainly observable by odor perceptible off the premises. Nevertheless entrance and seizure without a warrant was held unlawful. * * * However, although the *presence* of opium was observable, its location was not evident, and a search was in fact necessary; the authorization in the draft does not cover a search, but *only an entry for things already perceived and ready to hand.* (Last emphasis supplied.)

The appellant here relies upon *Johnson, supra;* the ALI draft on search and seizure points up the important distinction between the fact in *Johnson* and that in the case at bar.

B. *Seizure to prevent removal of evidence.*

■ The police officer had seen the auto transmission shortly before, the other missing parts from the Corvette he was at the moment viewing in the trunk of another car, obviously in preparation to be hauled away. He was obligated to recover the stolen transmission without giving the miscreants a chance to spirit this away, too. The officers had no idea how many persons other than those visible were involved, hence

On the basis of such a plain view discovery of the fruits of a crime which were identified both by description and label, it was not only reasonable for the officers to seize them notwithstanding the absence of a search warrant, but it would have been a derelic-

22. Section SS 6.06, Seizure Independent of Search, *supra.*

tion of their duty for them not to do so. To say that the police must leave evidence which they find (without engaging in an improper search) in order to go after a search warrant, on the assumption that the items will remain in the same place until they return with the warrant, is to ignore reality.[23]

The officers were confronted with a situation which called for immediate action. The action which they took, the seizure of the stolen transmission, was the reasonable action to satisfy the exigent circumstances present. *Chimel* and earlier Supreme Court precedents have recognized such preventive action as being constitutionally justified. As we said in *Thweatt, supra,* "Obviousness is a form of exigency in a sense that failure to act immediately when confronted with the evidence in this manner may result in its disappearance." [24]

## IV. *Inapplicability of the Authorities Relied on by the Dissent*

Our dissenting colleague invokes Vale v. Louisiana, *supra,* Taylor v. United States,[25] Katz v. United States,[26] and James v. United States, *supra,* in support of his view of what was reasonable for the two police officers in the circumstances of the case at bar. With all due respect to his analysis, we think our dissenting colleague's reliance upon these cases as determinative of this appellant's case is misplaced. Our own decision in *James* we have already discussed. We now turn to the three Supreme Court cases to show why they do not apply to Wright's situation here.

In Vale v. Louisiana, *supra,* the rationale of the opinion is heavy with emphasis on the strict protection to be accorded to a "dwelling" by the Fourth Amendment and, of course, it is "the right of the people to be secure in their persons, *houses,* etc.," which is protected,

houses apparently meaning dwelling, and being the only structure mentioned in the Fourth Amendment. A garage is not a house, nor is it a dwelling or home. We suggest that a garage is perhaps deserving of more strict protection than an open field a hundred yards from a home, perhaps as much or more than an automobile for housing which the garage is constructed, depending upon its location and use, but certainly the protection afforded is something less than that afforded the dwelling involved in *Vale.*

The dissent is somewhat misleading when it states "[t]he police did here *precisely* what the officers had done in *Vale.*" What the officers *did* may look similar, but the *knowledge* the officers possessed to justify what they did is quite different. A major distinction between Vale's case and that of Wright here is that the *police officers in Vale never had the narcotics illegally seized in the house in view,* plain or otherwise. Vale was arrested standing on his front steps, and the subsequent search of his house was thought to be justified as incident to that arrest. While it may be possible to justify the seizure in the case at bar as the product of a search incident to arrest, we have not sustained it on that ground, but on two separate grounds, only one of which was peripherally involved in *Vale, i. e.,* the necessity to prevent the removal or destruction of evidence.

Nor is Taylor v. United States, *supra,* appropos of the case at bar. First, in that case, no "plain view" of stolen goods or contraband was relied upon to support the seizure of Taylor's liquor in his garage. As the dissent says, the agents "saw many cardboard cases which they *thought probably* contained jars of liquor" (emphasis supplied). For all the agents *saw,* the cases could have contained cans of tomato soup.

23. United States v. Thweatt, 140 U.S.App. D.C. 120, 125, 433 F.2d 1226, 1231 (1970).

24. *Id.,* at 1231. *Cf.* United States v. Harris, *supra,* 435 F.2d at 80, 81, 83–84.

25. 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932).

26. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967).

Secondly, the prohibition agents had "over a considerable period [received] numerous complaints" concerning the use of Taylor's garage for making illicit liquor but "had made no effort to obtain a warrant for making a search." As the dissent quotes the Supreme Court, "They had abundant opportunity [to obtain a warrant] * * * there was no probability of material change in the situation * * *." Not so here, where part of the stolen auto parts had already been loaded and appellant and his two confederates were obviously engaged in spiriting away the fruits of the crime.

Thirdly, in *Taylor* the agents had to break a fastening on a door to enter. Here the officer walked in through the open door of the garage.

Under the circumstances in *Taylor*, the Court found the agents' act of physically breaking into the garage to be an exploratory *search* "undertaken with the hope of securing evidence upon which to indict and convict [Taylor]." Here Officer Huffstutler's act of entering Wright's garage was not to "search" it for evidence on which to convict him, but rather to "seize" stolen property (the transmission) that he had previously lawfully observed therein. As was said in Carroll v. United States,[27] upon which the decision in *Taylor* principally relied:

> The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo*. In the one case, the government is entitled to

the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government.[28]

Katz v. United States, *supra*, is likewise inapposite to the case at bar, for it dealt entirely with protection of audible communication under the Fourth Amendment,[29] and was, at least in part, formulated in reaction to the prospect of wholesale unwarranted "buggings" by the police. The decision, of course, is famous for its pronouncement that "the Fourth Amendment protects people, not places."[30] But that pronouncement is immediately followed by the statement "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection,"[31] and highly significant to the case at bar, citing as an example the "plain view" case of United States v. Lee,[32] in which it was held not to be an illegal search where the Coast Guard played a spotlight on petitioner's boat at night, disclosing on the deck several cartons of illicit liquor.

What *Katz* does broadly hint at is a basic principle that the Fourth Amendment protects from invasion by the police the actions and conversations that the ordinary individual would reasonably expect to be strictly private and free from perception by others, regardless of their locale. Thus, the remarks that:

> One who occupies [a telephone booth], shuts the door behind him, and pays

---

27. 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

28. *Id.*, at 149–150, 45 S.Ct., at 284 (quoting Mr. Justice Bradley in Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746).

29. As to the limited applicability of the rationale in *Katz* to other possible Fourth

Amendment violations, *see* the Supreme Court's recent opinion in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

30. 389 U.S. 347, 351, 88 S.Ct. 507, 511.

31. *Id.*

32. 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927).

the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.[33]

and,

The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a "search and seizure" within the meaning of the Fourth Amendment.[34]

But even under this basic principle, the appellant cannot prevail. For it cannot be said that his actions in storing the stolen transmission—which, no doubt, he would like to have kept hidden—in a garage having a nine-inch gap between the doors were calculated to keep his possession of it "strictly private and free from perception by others" any more than the petitioner in *Lee, supra,* could have expected the presence at night of the contraband liquor on the deck of his boat to be so.

The dissent (see note 1) appears to read *Katz* as if this decision ruled out the plain view doctrine—without even discussing it. But subsequent to *Katz* (1967) the Supreme Court reaffirmed the plain view doctrine in *Harris* (1968) and *Chimel* (1969), as we did *en banc* in *Dorman* (1970).

Of some relevance to the eventual seizure of the stolen transmission, the Court in *Katz* did say, "[O]nce it is recognized that the Fourth Amendment protects people—and not simply "areas"—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure."[35] This rationale would validate the physical intrusion of Officer Huffstutler into the ga-

rage following his plain view of the stolen property.

■ Basically, Fourth Amendment search and seizure questions turn, or should turn, upon a concept of reasonableness under the circumstances. Reasonableness has received many definitions in the thousands of cases arising under the Fourth Amendment. We consider and define the police conduct here as reasonable, and therefore the conviction is

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

I

" * * * The requirement of a warrant, as now generally understood, rests primarily on the conception that it is for a judicial officer, and not the prosecutor or police, to determine whether the security of our society, which is essential to the maintenance of a rule of law, requires that the right of privacy yield to a right of entry, search and seizure, and what limitation and specification of entry may be appropriate and reasonable. * * * "

Thus spoke this court *en banc* in Dorman v. United States, 140 U.S.App.D.C. 313, 317, 435 F.2d 385, 389 (1970). The *Dorman* holding is in harmony with the holding of the Supreme Court in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that, subject to a few carefully delineated exceptions, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Id.* at 357, 88 S.Ct. at 514. Moreover, specifically important to the disposition of this case is the Court's rejection in *Katz* of the traditional trespass test for Fourth Amendment violations and its adoption of the reasonable expectation of privacy

---

33. 389 U.S. 347, 352, 88 S.Ct. 507, 511.

34. *Id.,* at 353, 88 S.Ct., at 512.

35. *Id.*

criterion as controlling. The Court, identifying the new concept, stated:

" \* \* \* What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. \* \* \* But *what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.* \* \* \* "

*Id.* at 351–352, 88 S.Ct. at 511. (Emphasis added.) The Court in *Katz* went on to hold the unwarranted seizure of a conversation by monitoring a public telephone violates the Fourth Amendment.[1]

I submit that the seizure without warrant of the evidence in this case from appellant's premises violates the teaching of both *Dorman* and *Katz*.[2] More particularly, the majority opinion approving the seizure in this case is directly contrary to the holdings in two Supreme Court cases—one handed down at the last term of Court—and one case of our own almost identical on its facts to this case.

In Vale v. Louisiana, 399 U.S. 30, 33–34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the police, having witnessed the accused come out of his house into the street, make a sale of narcotics, and then begin to re-enter his house, arrested him on the sidewalk in front. Thereupon they entered the house and seized his supply. The Court held that the seizure was illegal for lack of a search warrant. The claim that the search of the house was an incident to the arrest outside was specifically rejected. The police did here precisely what the officers had done in *Vale, i. e.,* make an arrest outside and then enter the accused's adjoining premises to seize evidence of the crime.[3]

The second case, Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932), written for a unanimous Court by Mr. Justice McReynolds, is even closer on its facts to this case. The opinion succinctly states the facts:

"As the agents approached the garage they got the odor of whiskey coming from within. Aided by a searchlight, they looked through a small

1. If *Katz* is still the law, and everyone concedes it is, it is difficult to understand how the "plain view" doctrine, on which the majority relies here, can be taken seriously, particularly as justification for invading premises in non-exigent circumstances without a warrant. Certainly no one bent on crime is knowingly going to expose to the public the evidence to convict. Here the evidence was locked in a garage, so any suggestion that appellant knowingly exposed it to the public (or the police) would be absurd.

It should be kept in mind in the discussion which follows that the garage here actually had two doors: a front door, consisting of sliding panels, which locked from the inside, and a side door which swung on hinges and which locked with a combination lock from outside. At the time of the first search, when Officer Huffstutler knelt, looked through a crack in the front door with his flashlight, and spied the transmission, both the front door and the side door were locked. Later, at the time of the arrest, the front door was still locked. Appellant was arrested just outside the side door through which he and two others had just emerged. The officer then entered the garage through

the then unlocked side door and located and seized the transmission.

2. The majority's attempt to distinguish *Katz* is based on its characterization of the small opening through which the police looked into the garage as "a nine-inch gap between the doors." It suggests that because of this nine-inch gap appellant knowingly exposed the stolen transmission to the public and hence the police. The record shows that the "nine-inch gap" was actually an eight-inch slit one half inch wide (*compare* Transcript page 528 *with* Transcript page 9), and the police may have pulled on the doors so they could see inside. *See* Tr. 350–351, 386, 397–400, 440, 452–454, 497.

3. The District Court, ruling before *Vale* came down, upheld the seizure as an incident to the arrest. The majority here, appreciating the effect of *Vale* on the District Court's ruling, has sought to support that ruling on "plain view" grounds, and in so doing runs directly into *Katz* v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932).

opening and saw many cardboard cases which they thought probably contained jars of liquor. Thereupon they broke the fastening upon a door, entered and found one hundred twenty-two cases of whiskey. * * *" [4]

*Id.* at 5, 52 S.Ct. at 467. The Court held that in these circumstances the failure to obtain a warrant "was inexcusable and the seizure unreasonable." *Id.* at 6, 52 S.Ct. at 467.

The suggestion that the alleged exigency of the situation here made it unnecessary to obtain a warrant is also answered in *Taylor:*

"* * * They had abundant opportunity [to obtain a warrant] and to proceed in an orderly way even after the odor had emphasized their suspicions; there was no probability of material change in the situation during the time necessary to secure such warrant. Moreover, a short period of watching would have prevented any such possibility."

*Id.* at 6, 52 S.Ct. at 467.

The additional suggestion that, since the evidence was in "plain view," a warrant was unnecessary is likewise rejected in *Taylor.* There the agents, looking through "a small opening," saw the contraband whiskey in plain view, but that,

in the Supreme Court's judgment at least, did not make the seizure less "inexcusable" or "unreasonable." In fact the majority here cites no case at any level, state or federal, in which the plain view doctrine is held to justify entering premises, including a garage, without a warrant to make a seizure, and I have found none.[5] With other courts, apparently, *Taylor* seems to have settled the law on this point.

Indeed, until today this court followed *Taylor.* In James v. United States, 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969), as here the police peeped into a garage and saw evidence of crime sufficient, this court held, to establish probable cause to obtain a search warrant. The police, however, first entered the garage without a warrant and took the license number and the owner's manual off the car therein. Thereafter they obtained a search warrant, entered the garage and took photographs and other evidence. This court affirmed the District Court's holding suppressing the license number and owner's manual but allowing introduction of the evidence seized pursuant to the warrant. Thus the crucial difference between the legal and the illegal seizure, this court found, was the warrant. Yet today this court approves the seizure of evidence without warrant un-

---

4. This quoted language from *Taylor,* I submit, does not reasonably sustain the majority's speculation that "[f]or all the agents *saw,* the cases could have contained cans of tomato soup." The majority's other attempts to distinguish *Taylor* on its facts are likewise unavailing. As here, the garage doors in *Taylor* were locked and, as in *Taylor,* the opening through which the officers here peeked was small. The majority refers to the opening here as "a nine-inch gap between the doors." As indicated in Note 2, *supra,* the record shows that the opening here appears in fact to be a crack one half inch wide and eight inches long. In addition, the majority's characterization of the agents' action in *Taylor* as "an exploratory search" as contrasted with the "seizure" of the transmission here is difficult to understand. In *Taylor* the officers smelled and saw the cardboard cases containing the bottled liquor at the time they entered the garage.

Consequently, all they had to do was seize them. Here at the time the officers entered the garage they were unaware of the location of the transmission since it had been moved from its previous position. Officer Huffstutler described the transmission as the one "that I was looking for when I went into the garage." Tr. 129. Under the circumstances, not only were the police uncertain the transmission was still there, but a "search" of the garage was apparently required to find it.

5. In this connection it is interesting that the majority relies on automobile cases in applying its "plain view" thesis to a garage, in spite of the fact that Government counsel conceded at argument that he had found no case which, for Fourth Amendment purposes, equates a car with a garage or distinguishes between a house and a garage.

der precisely the circumstances so graphically disapproved in *James*.

With due deference, how the majority can uphold the seizure in this case in the face of *Vale*, *Taylor* and *James* is beyond me.[6]

## II

Peeping such as we have in this case into private buildings to see that which the occupant has chosen not to expose to public view is a search, and its lawfulness must be measured against the protective standards of the Fourth Amendment. Katz v. United States, *supra;* McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); State of Texas v. Gonzales, 5 Cir., 388 F.2d 145, 147 (1968); People of State of Cali-

fornia v. Hurst, 9 Cir., 325 F.2d 891, 898 (1963), reversed on other grounds, 381 U.S. 760, 85 S.Ct. 1796, 14 L.Ed.2d 713 (1965); Brock v. United States, 5 Cir., 223 F.2d 681, 685 (1955); *see* Whitley v. United States, 99 U.S.App.D.C. 159, 237 F.2d 787 (1956). Evidence of what was seen in this search is as much subject to suppression as the things would be if they had been physically seized. Katz v. United States, *supra;* McDonald v. United States, *supra;* Williams v. United States, 105 U.S.App.D.C. 41, 263 F.2d 487 (1959); Cohen v. Superior Court, 5 Cal.App.3d 429, 85 Cal.Rptr. 354 (1970); State v. Bryant, 287 Minn. 205, 177 N.W.2d 800 (1970); Ashby v. State, Fla.App., 228 So.2d 400 (1969). *Ashby* is remarkably similar to the instant case, in that the police gained knowledge

---

6. Abstractly speaking, the transmission, which was the evidence seized without warrant from the garage here, was not necessary to convict appellant in this case. A steering wheel, clutch plate and pressure plate—all 1967 equipment and each corresponding to items stripped from the stolen car—really were in plain view inside an open trunk of a car parked in the alley beside the garage at the time of appellant's arrest. Normally, these pieces of evidence would have been more than sufficient as a basis for appellant's conviction, and the admission of the transmission as additional evidence despite the motion to suppress might well have been harmless error. The Government, however, indicted appellant only for grand larceny of the transmission alone. And now, because of this apparent inadvertence on the part of the Government in obtaining an indictment against appellant, the majority obviously feels obliged to find some theory by which to save the conviction of an apparent criminal. The danger of such a procedure, of course, is that it involves distorting present case law and setting a precedent which may in the future have serious dangers for innocent citizens who believe that the Fourth Amendment protects their reasonable expectations of privacy.

I can sympathize with the majority's feeling that it was more efficient in terms of time and manpower for the police to search appellant's garage without a warrant after his arrest outside the garage. But maximization of police efficiency is *not* the only value with which our Bill of

Rights, and more particularly the Fourth Amendment, concerns itself. The equally crucial public interest in protecting the privacy of individual citizens must also be considered. As the Supreme Court told us in McDonald v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948), where the police looked from a common hallway in a rooming house through a transom into a room where an illegal lottery was in operation:

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

of the appellant's possession of stolen property "by looking through a crack in the garage door." 228 So.2d at 402. The court, relying substantially on Mc-Donald v. United States, *supra*, and Taylor v. United States, *supra*, held that the property thus seen and subsequently seized should have been suppressed:

> "The eye peering over a transom or peeking through a crack in the garage door does not come within the open-view doctrine and evidence seized through such a search without a warrant is not admissible without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

*Id.* at 407.

Without the information obtained by peeping, the location of the garage in relation to the abandoned car and the presence in front of the garage of sweepings suggestive of car stripping and rags similar to those found in the abandoned car here may well have persuaded a magistrate to issue a search warrant. But there was no grave emergency which would elevate unchecked police suspicion to legal justification for a search without prior judicial determination. Katz v. United States, *supra*, 389 U.S. at 357, 88 S.Ct. 507. Seeking such a warrant was one appropriate and lawful course the police might have taken. If additional evidence for a warrant were required, interviewing neighbors as to events in the alley, interviewing the owner of the garage, and placing the garage under surveillance may have produced it. But the fact that the police would probably have been able to discover sufficient evidence by constitutional means cannot be used to save an unconstitutional course of action.

What bewilders me as much as the majority's apparent disregard for the importance to society that an individual's reasonable expectations of privacy be protected is the way in which it finds direct and unambiguous support for its novel holding in previous cases from our circuit which are by no means clearly apposite. For example, the majority seeks to justify the legality of Officer Huffstutler's first look into the garage as "a closer look at a challenging situation." But its support for this theory is Dorsey v. United States, 125 U.S.App. D.C. 355, 372 F.2d 928 (1967), which dealt with the search of a car and which specifically held that "[a] car parked at 14th and U Streets at 11 o'clock at night, occupied by known narcotics offenders, bears little resemblance to a home or dwelling." 125 U.S.App.D.C. at 358, 372 F.2d at 931. What the majority effortlessly glosses over is the traditional Fourth Amendment law distinction between cars and buildings specifically mentioned in *Dorsey* and developed by the Supreme Court beginning with Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Nor is the majority's justification of the first look into the garage on "plain view" theory on more stable ground. In James v. United States, *supra*, on which the majority heavily relies, where the garage door was left raised four feet from the floor, this court indicated that police are free to observe circumstances in evidence that are in "plain view" to the public. "That the policeman may have to crane his neck, or bend over, or squat, does not render the doctrine inapplicable, so long as what he saw would have been visible to any curious passerby." 135 U.S.App.D.C. at 315 n. 1, 418 F.2d at 1151 n. 1. But isn't it at least troubling that here, as in *Taylor*, the garage door was *locked* [7] and the police, again as in *Taylor*, had to use special equipment such as a flashlight to see inside? Certainly a flashlight is not standard equipment for "any curious passerby," particularly in the daytime. Isn't there also a serious danger that the "plain view" holding of the majority in this case is inconsistent with the Supreme Court decision in *Katz*, which held that what a person "seeks to preserve as private, even in an area accessible to the

7. *See* Tr. 346–348, 385.

public, may be constitutionally protected"? 389 U.S. at 351–352, 88 S.Ct. at 511. Is it not important to our American way of life that when a citizen does as much as ordinary care requires to shield his sanctuary from strangers his constitutional right to maintain his privacy should not be made to depend upon the resources of skillful peepers and eavesdroppers who can always find ways to intrude?

### III

The opinion of the majority of the panel in this case—while it may well go unnoticed in the hustle and bustle of a society troubled with overcrowded criminal dockets—flies in the face of clearly established legal principles and is representative of a dangerous propensity to emasculate the Fourth Amendment. The majority opinion rests on a definition of "reasonableness" which "considers and defines" the reasonableness[8] of police conduct solely in terms of the public interest in detection and prevention of crime, rather than in terms of a balance between the public interest in effective law enforcement and the equally crucial public interest in protecting the privacy of individual citizens. "[T]he forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment." United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210 (1948).

There are, of course, still homes whose privacy is protected by high fences and broad lawns. But in many homes now a "plain view" of the bedroom, as well as the garage, is available to resourceful peepers, particularly those with special equipment, from the sidewalk or street. After today in the nation's capital, the occupants of those homes, respected citizens as well as law violators, will have more to worry about than the traditional type Peeping Tom.

I respectfully dissent.

On Appellant's Suggestion for Rehearing en Banc.

Before BAZELON, Chief Judge, WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, *en banc.*

### ORDER

PER CURIAM.

On consideration of appellant's suggestion for rehearing *en banc*, of appellant's supplement thereto and of appellee's opposition, it is

Ordered by the Court *en banc* that appellant's aforesaid suggestion for rehearing *en banc* is denied.

Statement of Circuit Judge WRIGHT, in which Chief Judge BAZELON joins, as to Why He Voted to Grant Rehearing *En Banc*

As shown in my dissent to the panel opinion, the majority opinion in this case is in direct conflict with two Supreme Court cases and one of our own. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932); James v. United States, 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969). Moreover, since the majority undertook to decide the case on an issue not raised in the briefs, it did not have before it two recent opinions from other circuits which are also squarely in conflict with its opinion. Pendleton v. Nelson, 9 Cir.,

---

8. The majority closes with the statement, "We consider and define the police conduct here as reasonable, and therefore the conviction is [a]ffirmed." The concept of reasonableness under the Fourth Amendment is, of course, difficult to define. But the many cases on the subject have laid out the constitutional guidelines so that protection of privacy will not depend on *ad hoc* judgments by police. I submit that the majority's action here fails to follow the constitutional guidelines which the Supreme Court and other courts have sought to stake out in protecting citizens from unlawful official intrusion.

404 F.2d 1074 (1968); Niro v. United States, 1 Cir., 388 F.2d 535 (1968).

The question decided by the majority opinion (at 1359–1362), but not raised by the parties, is whether under the plain view doctrine, absent exigent circumstances, police may make a warrantless entry on premises and seize what they believe to be evidence of crime. The majority answered this question in the affirmative. Until this case no court has ever so held. For a Supreme Court case holding precisely the opposite on facts remarkably close to the facts here, see Taylor v. United States, *supra*.

With respect to the issue decided by the majority but not raised by the parties, appellant's petition for rehearing and suggestion for rehearing *en banc* asserts, *inter alia*, that the majority opinion herein is *"squarely contrary to decisions of the Courts of Appeals of the First and Ninth Circuits"* (emphasis in original), citing Pendleton v. Nelson, *supra*, and Niro v. United States, *supra*. A reading of these two cases confirms appellant's charge. Yet the Government in its response carefully answers the charge by ignoring it and the two cases supporting it. Neither in its original brief nor in its response to the petition for rehearing and the suggestion for rehearing *en banc* does the Government even cite these two cases. The reason why the Government ignores appellant's charge and these two cases, of course, is obvious, as a reading of the cases will indicate.

Since the panel opinion came down, the Supreme Court has decided Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In that case the Court, in an opinion by Mr. Justice Stewart relying squarely on Taylor v. United States, *supra*, held (1) that the plain view doctrine, absent exigent circumstances may not provide the basis for a warrantless intrusion, and (2) that, after lawful entry but without a search warrant, to be legally seized "the discovery of evidence in plain view must be inadvertent." 403 U.S. at 469, 91 S.Ct. at 2040. The panel opinion here is in the teeth of these two plain view doctrine limitations. Here, admittedly, the intrusion was warrantless and, admittedly, the police knew the property seized was on the premises before they entered.

For the reasons stated in my dissent to the panel opinion, together with the reasons given by the Supreme Court in *Coolidge* and by the Ninth and First Circuits in the *Pendleton* and *Niro* opinions, I am unable to understand why the panel majority persists in its opinion. Since it does, in my judgment the integrity of the judicial process requires a rehearing *en banc*.