[No. 30907-2-I. Division One. July 18, 1994.]

THE STATE OF WASHINGTON, *Appellant*, v. RYAN B. ROSE, *Respondent*.

---

*Seth R. Dawson, Prosecuting Attorney,* and *Scott Olson, Deputy,* for appellant.

*Jessica Ryan* of *Washington Appellate Defender Association,* for respondent.

KENNEDY, J. — In this case the State of Washington asks us to reverse the trial court's suppression of evidence seized from the residence of Ryan B. Rose. The State contends the suppression was improper because (1) Rose's landlord, Yarton, had authority to consent to the police search of the property, (2) the warrant was valid because it was based on evidence of illegal activity observed in open view, and (3) even excluding evidence from an illegal search, the officer's observations still establish probable cause for the search warrant which issued. We reject the State's contentions and affirm the trial court's order suppressing the illegally obtained evidence.[1]

## FACTS

Rose rented a 5-acre lot from Yarton pursuant to a 6-month written lease. The property contained a mobile home, a large garage and a smaller shed. The access route to the rental

---

[1] In reaching this result, in consideration of the constitutional rights at stake we make an independent evaluation of the evidence, allowing "great significance" to the findings of fact, and deference to the credibility issues. *State v. Hill,* 68 Wn. App. 300, 304, 842 P.2d 996, *review denied,* 121 Wn.2d 1020 (1993); *State v. Mennegar,* 114 Wn.2d 304, 309-10, 787 P.2d 1347 (1990).

property was a 250-foot-long driveway which branched off a private road leading to Yarton's residential property. The driveway to the rented property ended in a gravel parking area. The parking area was bordered by the garage on the right and the mobile home on the left. The shed was about 19 yards behind the mobile home beyond a grassy area located behind the home. The shed was located at the edge of a heavily wooded area. The view of the shed from the parking area and mobile home was partially obscured by branches of trees in the wooded area. A gravel path led from the parking area to the front porch of the mobile home. There was no discernible path leading to the shed.[2]

In addition to the written lease, there was an oral agreement wherein Yarton was entitled to use part of the garage for storage. Yarton agreed to perform maintenance on the property, such as mowing the grass and cutting brush. Yarton was not required to give Rose notice before entering the property for these purposes.

On October 28, 1991, Yarton served Rose with an eviction notice and told him to vacate within 30 days. Rose agreed to leave at the end of November. His rent was fully paid for the month of November. On November 18, Yarton came onto the property to store some items. While there he noticed the mobile home was in a state of disrepair. Yarton walked around to assess the condition of the mobile home and outbuildings. Upon approaching the shed he noticed the odor of what he believed to be marijuana.

Yarton reported his suspicion to the police. The report was investigated by Deputy Ty Dekofski of the Snohomish County Sheriffs office. Dekofski learned from Yarton that Yarton had access to the property because of the shared storage and the maintenance tasks he performed there. Based on this information, Dekofski concluded that Yarton had the authority to consent to a search of the property.

Yarton and Dekofski drove up to the property and then walked together to the shed, which was found to be locked.

---

[2]The record contains a videotape which shows the driveway, parking area, garage, mobile home, grassy area, shed and wooded area here described.

From there, Dekofski could smell marijuana and he noticed electricity lines and a garden hose running into the shed. Dekofski walked back to the mobile home, looking in a back window as he did so. He walked around to the front of the home, climbed the steps and knocked on the door. From there he could see into the living room through a window.[3] On the table inside he could see marijuana, packaging materials and a gram scale. A dog could be heard barking from inside the home. Dekofski testified that he did not shine his flashlight through the window; Yarton testified that he did. The trial court believed Yarton's testimony, perhaps because this visit to the property occurred in the nighttime hours.

Shortly thereafter two young men pulled up and claimed to be looking for Rose. Dekofski became suspicious when he noticed the men had bolt cutters, and decided to "Mirandize" them. After waiving their rights, the men revealed that they were on the property to steal Rose's marijuana growing operation.

Based on his observations while on the property, Dekofski obtained a telephonic search warrant. On serving the warrant, police found a complete growing operation and 14 pounds of marijuana. Rose was charged with possession of marijuana with intent to manufacture or deliver. At a pretrial hearing the trial court suppressed the evidence obtained. The State filed this timely appeal.

## DISCUSSION
### Landlord's Actual Authority To Consent to a Police Search

The State contends that Dekofski was lawfully on the premises because Yarton had actual authority to consent to a search of property. We disagree.

 In general, a landlord has no actual authority to consent to a search and seizure on behalf of a tenant where the tenant is in undisputed possession of the property. *State v. Christian*, 95 Wn.2d 655, 659, 628 P.2d 806 (1981). However,

---

[3]The record indicates the presence of a ragged curtain hanging on the window. This curtain did not hinder Dekofski's view into the living room.

a landlord may consent to a search of a tenant's apartment if the tenancy has expired, will not be renewed, and the tenant has been notified that the landlord will be on the premises to clean the apartment. *Christian*, 95 Wn.2d at 659. The State relies on the *Christian* exception.

We find this exception inapplicable. At the time of the search, Rose's tenancy had not yet expired. Rose had paid rent through the end of November, and was entitled to possession of the property until that time. Further, on the date of the search Yarton had not notified Rose that he would treat the lease as expired or that he would enter the property for inspection or cleaning purposes.

Landlord's Common Authority
To Consent to a Search

The State next contends that Yarton's common authority over the property gave him authority to consent to a search. We disagree.

"[C]onsent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974).[4] The question of common authority is determined by the relationship between the parties:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n.7; *accord State v. Mathe*, 102 Wn.2d 537, 543, 688 P.2d 859 (1984). Where the rights concerning the premises are those incidental to the landlord-tenant relationship, and the tenant is in exclusive posses-

---

[4]This is because the cotenant assumes the risk that a search of a common area may be consented to by an individual having equal authority over this area. *State v. Talley*, 14 Wn. App. 484, 487, 543 P.2d 348 (1975).

sion of the property, an inference that a search is authorized is unfounded. *Mathe*, 102 Wn.2d at 544 (citing *Christian*, 95 Wn.2d at 659).

The State argues that Yarton's right to unrestricted access when he mowed the grass and performed other maintenance tasks changed the nature of the relationship into something other than that of landlord and tenant. We disagree.

■ A tenant does not lose his or her expectation of privacy where a landlord is permitted to enter the premises for certain specified reasons. The limited right of entry reserved to a landlord does not translate into a general waiver of constitutional protections by the tenant. *See United States v. Warner*, 843 F.2d 401, 403 (9th Cir. 1988) (tenant's agreement that landlord had permission to enter the premises to make certain repairs and mow the lawn did not translate into an unlimited right of access for most purposes); *United States v. Impink*, 728 F.2d 1228, 1233 (9th Cir. 1984) (landlord's reservation of a limited right to enter the garage did not convey an unlimited right of access).

The agreement between Rose and Yarton restricted Yarton's right of access to specified tasks in specified areas. We refuse to transform this limited consensual relinquishment of privacy by Rose into a general waiver of his reasonable expectation of privacy. Accordingly, we hold that Yarton may have entered the premises initially for legitimate purposes of storage, maintenance or inspection on November 18, 1991, but that he had no actual authority to consent to a police search on the property.

### Landlord's Apparent Authority To Consent
### to a Police Search

Next, the State argues that Dekofski was justified in believing that Yarton had authority to consent to entry by the officer, based on Yarton's right to enter the premises without notice to Rose. We disagree.

■■ Apparent authority upholds an officer's *reasonable* belief of common authority to validate an entry whether or not the authority in fact existed. *Illinois v. Rodriguez*, 497

U.S. 177, 111 L. Ed. 2d 148, 161, 110 S. Ct. 2793 (1990). Apparent authority applies "to situations in which an officer would have had valid consent to search if the *facts* were as he reasonably believed them to be." (Italics ours.) *United States v. Whitfield*, 939 F.2d 1071, 1074 (D.C. Cir. 1991). A search premised upon an erroneous view of the *law* will not be validated by the doctrine of apparent authority. *Whitfield*, 939 F.2d at 1073-74.

An officer's conclusion that because the landlord was authorized to enter her tenant's apartment when necessary to turn off electrical appliances or lights she could consent to a search of his apartment was a misapprehension of the law, and therefore not subject to the application of the apparent authority doctrine. *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992).

Our Supreme Court has warned against expanding the doctrine of apparent authority:

> It is fundamental that the doctrine which recognizes the validity of a third party's consent to a search must be applied guardedly to prevent erosion of the protection of the Fourth Amendment, since it makes no requirement of the existence of probable cause for the search and does not constitute an exception based on necessity.

*State v. Smith*, 88 Wn.2d 127, 156, 559 P.2d 970 (Horowitz, J., dissenting) (quoting *United States ex rel. Cabey v. Mazurkiewicz*, 431 F.2d 839, 843 (3d Cir. 1970)), *cert. denied*, 434 U.S. 876, 54 L. Ed. 2d 155, 98 S. Ct. 226 (1977). Similarly, the United States Supreme Court has stated:

> Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of "apparent authority."

*Stoner v. California*, 376 U.S. 483, 488, 11 L. Ed. 2d 856, 84 S. Ct. 889 (1964).

As in *Brown*, this case involves a mistake of law, not a reasonable misapprehension of fact. We conclude that Officer Dekofski's trip to the locked shed constituted an unlawful search. The locked shed was within the curtilage of the home. The route to the shed was not impliedly open to

the public. Compare *State v. Seagull*, 95 Wn.2d 898, 900-05, 632 P.2d 44 (1981); *see State v. Hoke*, 72 Wn. App. 869, 866 P.2d 670 (1994). We affirm the trial court's conclusion that Yarton had no actual or apparent authority to consent to Officer Dekofski's search of the premises. The grow operation and marijuana found in the locked shed were properly suppressed in that the search warrant for the shed was based on illegally obtained evidence.

## The Open View Doctrine

Next, the State contends that the evidence the officer observed inside Rose's residence was in open view and thus not subject to any reasonable expectation of privacy. We disagree.

■ An open view observation occurs:

> when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search" within the meaning of the Fourth Amendment.

*State v. Seagull*, 95 Wn.2d at 901 (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.2, at 240 (1978)); *see also Katz v. United States*, 389 U.S. 347, 351, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) ("[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). An "open view" observation does not constitute a "search" under either the Fourth Amendment or under the state constitution. *Tukwila v. Nalder*, 53 Wn. App. 746, 752, 770 P.2d 670 (1989).

■ It is well established that police officers on "legitimate business"

> may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. An officer is permitted the same license to intrude as a reasonably respectful citizen. However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy.

(Citations omitted.) *State v. Seagull*, 95 Wn.2d at 902-03; *State v. Myers*, 117 Wn.2d 332, 344, 815 P.2d 761 (1991) (officers who approach a front porch in connection with an investigation may do so with their eyes open, as the porch is not a constitutionally protected area).

Consequently, the issue here is whether Dekofski "substantially or unreasonably" departed from the normal access route to the mobile home or employed "a particularly intrusive method of viewing" when he peered into the back window of the home and shone a flashlight into the front window of Rose's home. Compare *State v. Graffius*, 74 Wn. App. 23, 871 P.2d 1115 (1994) (officer's intentional observation of marijuana in a partially opened garbage can did not constitute a particularly intrusive method of viewing).

The *Seagull* court considered several factors to test the intrusiveness of the observation, including whether the officer: (1) spied into the house; (2) acted secretly; (3) approached the house in daylight; (4) used the normal, most direct access route to the house; (5) attempted to talk with the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally. *Seagull*, 95 Wn.2d at 905.

A consideration of the *Seagull* factors supports the trial court's suppression ruling here. The two most notable factors are Dekofski's first going to the shed located some 19 yards in back of the mobile home and then spying into the back and front windows of the home and creating an artificial vantage point by using a flashlight to see into Rose's living room.

The State ignores the trip to the shed and argues that no unreasonable intrusion occurred when Dekofski peered into the windows of Rose's residence. We disagree, even if it could be said that Dekofski's observations as he peered into the interior of the home were untainted by his illegal trip to the locked shed moments earlier.

Officers on legitimate police business who peered through a 6-inch crack between the casing of the window and the drape unreasonably intruded upon the defendant's reasonable expectation of privacy in *State v. Jordan*, 29 Wn. App.

924, 928-29, 631 P.2d 989 (1981). By drawing the curtains the individuals inside the duplex had clearly demonstrated a reasonable expectation of privacy. *Jordan*, 29 Wn. App. at 927. The fact that the occupants had not completely succeeded in shutting the curtains did not diminish the reasonableness of their expectation of privacy. *Jordan*, 29 Wn. App. at 927.

Where the evidence of illegal activity could be seen through the front window even without the aid of binoculars from 40 to 50 feet away, visual observation by police did not constitute an unreasonable intrusion. *State v. Manly*, 85 Wn.2d 120, 124, 530 P.2d 306, *cert. denied*, 423 U.S. 855, 46 L. Ed. 2d 81, 96 S. Ct. 104 (1975).

Although the front window on Rose's mobile home was covered with only a ragged curtain, there was nonetheless some attempt to prevent casual observation of the interior of the home. In addition, the mobile home was located at the end of a very long driveway which was connected to a private road, and the search occurred at night. These facts indicate an even greater expectation of privacy by Rose than the tenants involved in *Manly* and *Jordan*. We find that Dekofski's peering into the windows of Rose's residence during the nighttime hours with the aid of a flashlight constituted an unreasonable intrusion into Rose's reasonable expectation of privacy.

The State also argues that the use of a flashlight by Dekofski did not create an artificial vantage point. We disagree.

Washington case law indicates that the use of a flashlight in an automobile search is constitutional.[5] However, a search

---

[5]*See State v. Young*, 28 Wn. App. 412, 624 P.2d 725 (holding no search of automobile when police officer shone his flashlight into the interior of defendant's unoccupied automobile following a burglary; looking into a car parked in a public place and observing what is exposed to open view is not conducting a search in the constitutional sense), *review denied*, 95 Wn.2d 1024 (1981); *State v. Cagle*, 5 Wn. App. 644, 646, 490 P.2d 123 (the fact that officer was aided by the use of a flashlight to see what would have been clearly visible in daylight does not transform his observations into a search), *review denied*, 80 Wn.2d 1003 (1971).

by an officer who shone a light through a minute crack in the wall in order to observe items within a locked storage building was invalidated in *State v. Tarantino*, 322 N.C. 386, 368 S.E.2d 588 (1988), *cert. denied*, 489 U.S. 1010, 103 L. Ed. 2d 180, 109 S. Ct. 1117 (1989).[6]

The invalidation of Dekofski's search is even more compelling than in *Tarantino* because of the enormous expectation of privacy with regard to the interior of a personal residence. This is not simply a case wherein the flashlight illuminated what could normally have been seen during the day. Whether we live on a city lot or on acreage in the country, we do not expect that the police will perform exploratory searches in the nighttime hours by peering into the interiors of our homes by the aid of a flashlight. The trial court properly suppressed the evidence obtained in the search of Rose's home, in that the search warrant for the home was based on illegally obtained evidence.

### The Validity of the Search Warrant
### Based on Yarton's Statement

The State contends that even if the information learned from an illegal search by the police officer is suppressed, the search warrant is not invalid because Yarton's statement that he believed he smelled marijuana near the shed was sufficient to establish probable cause for the issuance of the warrant. We disagree.

A search warrant is not rendered totally invalid if the affidavit contains sufficient facts to establish probable cause independent of the illegally obtained information. *State v. Coates*, 107 Wn.2d 882, 888, 735 P.2d 64 (1987). However, we find Yarton's suspicion that Rose was engaged in criminal

---

[6]Compare *People v. Wheeler*, 28 Cal. App. 3d 1065, 105 Cal. Rptr. 56 (1972) (upholding police conduct where officer, standing in a lawful position, shone his flashlight through an open garage door to observe stolen property); *United States v. Wright*, 449 F.2d 1355, 1364 (D.C. Cir. 1971) (upholding police conduct where officer shone flashlight through gap in garage door to observe stolen property, stating, "it cannot be said that [the appellant's] actions in storing the stolen transmission — which, no doubt, he would like to have kept hidden — in a garage having a nine-inch gap between the doors were calculated to keep his possession of it 'strictly private and free from perception by others' "), *cert. denied*, 405 U.S. 947, 30 L. Ed. 2d 817, 92 S. Ct. 986 (1972).

activity is insufficient to establish probable cause. *Cf. State v. Ridgway*, 57 Wn. App. 915, 790 P.2d 1263 (1990).

In *Ridgway* a tax assessor observed and later took pictures of plants on the defendant's property that he believed to be marijuana. The photos were turned over to the sheriffs department when the assessor reported his suspicions. The affidavit for probable cause described the photos and recited that the plants shown in them did appear to have the same shape and color as marijuana. The affidavit also described a police visit to the premises and the deputy's observation of the marijuana plants on the steps.

The *Ridgway* court concluded, without discussion, that the photo and information provided by the tax assessor did not supply probable cause for the warrant. 57 Wn. App. at 918. Later in the opinion the court noted that probable cause to issue a warrant is established by the presentation of facts that would lead a reasonable person to conclude that there is a probability that the defendant is involved in criminal activity, and those facts were lacking.

██ ██ We believe that the naked assertion by Yarton that he believed he smelled marijuana, without more, would not lead a reasonable person to conclude that Rose was involved in criminal activity. Even such bare assertions by police officers are not sufficient. The police must provide information from which a disinterested magistrate could conclude that, based on the officer's training and experience, what the officer believed to be the odor of marijuana probably was marijuana. *State v. Remboldt*, 64 Wn. App. 505, 510, 827 P.2d 282 (an assertion that marijuana was smelled by an officer must be presented to an issuing magistrate as more than a mere personal belief) (quoting *State v. Vonhof*, 51 Wn. App. 33, 41, 751 P.2d 1221, *review denied*, 111 Wn.2d 1010 (1988), *cert. denied*, 488 U.S. 1008, 102 L. Ed. 2d 782, 109 S. Ct. 790 (1989)), *review denied*, 119 Wn.2d 1005 (1992). Accordingly, we find the warrant cannot be upheld on Yarton's statement alone. The warrant fails entirely.[7]

---

[7]The State does not argue that the evidence that the two young men had come to the property with the purpose of stealing Rose's grow operation would in any

We affirm the trial court's suppression of the evidence seized from Rose's residence and from the locked shed.

BAKER, J., concurs.

AGID, J. (dissenting) — Because the evidence on the table was in open view, Deputy Dekofski viewed it from a lawful vantage point, and his use of a flashlight to see it was not an unwarranted intrusion into Rose's privacy, I dissent. I express no view on the majority's apparent authority analysis because the marijuana, packaging materials and gram scale observed through the unobscured front window were sufficient to support the warrant and preclude suppression of the evidence at trial.

The majority correctly states the basis of the open view doctrine as set forth in *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981), and the factors the courts are to consider in determining whether an officer has intruded on a constitutionally protected expectation of privacy by exceeding the scope of his or her implied invitation to come on to the portions of the property open to the public. Majority, at 36-37. However, I cannot agree with its conclusion that: "Dekofski's peering into the windows of Rose's residence during the nighttime hours with the aid of a flashlight constituted an unreasonable intrusion into Rose's reasonable expectation of privacy."[8] Majority, at 38.

---

way affect this outcome. We believe that that evidence, standing alone, or in conjunction with Yarton's suspicions, would not validate the warrant. In any event, we are not willing to say that it would, in the absence of any briefing or argument on the issue.

[8]It is unclear whether or not the majority is relying on a conclusion that the legality of the approach to the house was tainted by what it states was an illegal trip to the shed to reject the State's open view argument. Majority, at 37. If it is, I question the validity of this conclusion as well. First, the shed was only 19 feet from the house, and the officer could observe the water and power lines going to the shed from the gravel area and paths around the mobile home. Second, the trip to the shed is irrelevant because the warrant was valid based solely on the evidence observed in the house. Third, the deputy did not make a surreptitious trip to the shed or use it to hide or disguise his presence on the property so that

The majority concedes that the "ragged curtain" hanging on the living room window "did not hinder Dekofski's view into the living room". Majority, at 32 n.3. Thus, its reliance on *State v. Jordan*, 29 Wn. App. 924, 928-29, 631 P.2d 989 (1981) is misplaced. Majority, at 37-38. The drapes in *Jordan* were almost closed. It was the act of attempting to close them and thereby achieve privacy within the house on which the court relied in concluding that peering through the 6-inch crack was an invasion of that privacy. Here, there was nothing that effectively blocked one's view from the porch and, hence, no evidence that the occupant intended to obscure from view "that which [was] there to be seen" from the front porch. *Seagull*, 95 Wn.2d at 901.[9]

Thus, I conclude that the majority's real quarrel here is with Deputy Dekofski's use of a flashlight to enhance his

---

he could sneak up on the occupants while they were unaware of his presence. A deviation from the most direct route to the residence is not fatal because

> [i]t would be unreasonable to require, in every case, that police officers walk a tightrope while on private property engaging in legitimate police business. Absent such a requirement, we cannot say the limited deviation, within the open area, that occurred in this case was so unreasonable as to be an intrusion upon a privacy expectation deserving of Fourth Amendment protection under *Katz v. United States*, [389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)].

*Seagull*, 95 Wn.2d at 905.

As in *Seagull*, Deputy Dekofski's route to the vantage point from which he observed the marijuana, packaging materials and scales "would have been a normal one to take if he had gone directly to that door from his car in the parking area." 95 Wn.2d at 905. The side trip to the shed does not render inadmissible the evidence he legitimately discovered from the front porch of the residence. *See State v. Myers*, 117 Wn.2d 332, 345, 815 P.2d 761 (1991) ("If the officer substantially or unreasonably departs from a nonintrusive area . . . he may exceed the scope of 'open view'."). A detour of 15 to 19 feet, which amounts to only a few steps, from the gravel area is not a "substantial" or "unreasonable" one under the facts of this case.

[9]The majority also relies on the location of Rose's property at the end of "a very long [250-foot] driveway" as additional evidence of Rose's expectation of privacy. Majority, at 38. However, the length of a driveway is irrelevant to the question of whether evidence was in open view. Rather, it is a consideration in determining whether law enforcement officials were legitimately on the property in the first place. *State v. Ridgway*, 57 Wn. App. 915, 918, 790 P.2d 1263 (1990). Here, there is no issue of whether the deputy legitimately entered the property. An officer who receives a report of an alleged crime may go on the property to investigate. *Seagull*, 95 Wn.2d at 902 n.1.

ability to see into the residence. The majority acknowl-
edges that we have previously approved the use of flash-
lights to look into cars. Majority, at 38-39 & n.5. In that
context we have

align[ed] ourselves with the almost universal view, that [the]
use of a flashlight is not a search at all.

When the circumstances of a particular case are such that
the police officer's observation would not have constituted a
search had it occurred in daylight, then the fact that the of-
ficer used a flashlight to pierce the nighttime darkness does
not transform his observation into a search.

*State v. Young*, 28 Wn. App. 412, 417, 624 P.2d 725 (quoting
*Marshall v. United States*, 422 F.2d 185, 189 (5th Cir. 1970)),
*review denied*, 95 Wn.2d 1024 (1981); *accord State v. Cagle*,
5 Wn. App. 644, 646, 490 P.2d 123 (relying on *Marshall v.
United States, supra*, for the proposition that "[t]he mere use
of a flashlight, however, does not magically transmute a
non-accusatory visual encounter into a Fourth Amendment
search"), *review denied*, 80 Wn.2d 1003 (1971); *see also Texas
v. Brown*, 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535
(1983); *State v. Regan*, 76 Wn.2d 331, 336-37, 457 P.2d 1016
(1969).

Both the Supreme Court and this court have also held that
the use of binoculars, another artificial means of enhancing
an officer's view of what he or she would otherwise be able
to see from a lawful vantage point, does not constitute a
search. *State v. Manly*, 85 Wn.2d 120, 124, 530 P.2d 306
(marijuana plants in a dormitory window observed from the
street; officer used binoculars to confirm a report the plants
were marijuana), *cert. denied*, 423 U.S. 855 (1975);[10] *State v.
Jones*, 33 Wn. App. 275, 277, 653 P.2d 1369 (1982) (binocu-
lars used to observe defendant inhaling cocaine in a car),
*review denied*, 99 Wn.2d 1003 (1983). I fail to see any distinc-
tion between the use of binoculars in *Manly*, which also
involved a residence, and the use of a flashlight in this case.

---

[10]From the recitation of the facts in *Manly*, it is not at all clear that the officer
could actually see anything except green vegetation without the aid of binoculars.
It appears he needed them to identify the plants as marijuana in the first instance.
85 Wn.2d at 121.

Thus, there must be some basis other than an absolute prohibition on devices that enhance an officer's ability to see what is, but for distance or darkness, there to be seen. As I read the majority opinion, it seeks to locate this distinction in the fact that this case involved items in open view in a home rather than in an outbuilding, garage or other structure. This, too, is not a valid distinction.

The majority relies on a North Carolina case, *State v. Tarantino*, 322 N.C. 386, 368 S.E.2d 588 (1988), *cert. denied*, 489 U.S. 1010 (1989), and the "enormous expectation of privacy with regard to the interior of a personal residence" for its conclusion that Deputy Dekofski exceeded the scope of his implied invitation under the open view doctrine. Majority, at 39. It rejects the rationale of *People v. Wheeler*, 28 Cal. App. 3d 1065, 105 Cal. Rptr. 56 (1972) (shining flashlight through garage door to observe a stereo cabinet reported stolen by witness to burglary is not a search) and *United States v. Wright*, 449 F.2d 1355 (D.C. Cir. 1971) (shining flashlight into 9-inch gap between locked garage doors to see stolen car parts not a search), *cert. denied*, 405 U.S. 947 (1972), presumably because those cases involved garages rather than residences. *Tarantino*, however, also involved an outbuilding, a storage shed, and facts that do not remotely resemble the facts in this case. In *Tarantino*, the officer received no response to his initial knocks on the front door. He then "climbed the hill to the second-story porch, using a flashlight to guide his way along a little-used path". 322 N.C. at 388. He again knocked and, receiving no response, peered though cracks that "were no more than one-quarter of an inch wide" after "maneuvering his body and shining his flashlight through" them. 322 N.C. at 388. This is a far cry from shining a flashlight into an uncovered window through which the deputy in this case could see from his lawful vantage point on the front porch of Rose's residence.

While I agree that we recognize a heightened degree of privacy in a residence, Fourth Amendment protection also extends to the surrounding curtilage of a residence. The curtilage encompasses property in proximity to a dwelling,

including other structures, which "an individual reasonably may expect . . . should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300, 94 L. Ed. 2d 326, 107 S. Ct. 1134 (1987); *accord State v. Ridgway*, 57 Wn. App. 915, 918, 790 P.2d 1263 (1990). Whether a structure is within the curtilage depends upon its proximity to the home, whether it is within the same enclosure as the home, the uses to which the area is put and what the occupant has done to prevent observation into it by passersby. *Dunn*, 480 U.S. at 301. Because the buildings involved in *Tarantino*, *Wheeler* and *Wright* were outbuildings within the curtilage of a residence, the fact that this case involves a residence rather than an outbuilding is, legally, a distinction without a difference.

Finally, I do not find the majority's emphasis on the fact that the events took place at night persuasive or dispositive of the issue in the case. Majority, at 38-39. Presumably, the majority emphasizes this point to distinguish the events here from the daylight view of the greenhouse approved in *Seagull*. In *Seagull*, the court noted a number of circumstances relevant to its conclusion that the officer in that case had not intruded on a constitutionally protected expectation of privacy. 95 Wn.2d at 905. Among those factors, the court observed that "all acts occurred during daylight hours". 95 Wn.2d at 905.

While I agree that the time of day or night may be relevant in determining whether an officer has acted as "a reasonably respectful citizen", 95 Wn.2d at 902, and, thus, not exceeded the scope of his or her implied invitation to enter private property, it is apparent from the opinion in *Seagull* that none of the circumstances the court relied on to uphold that particular warrant is critical to its conclusion. Rather, it emphasized several times that each case requires a fact-specific inquiry, and no set of circumstances is determinative. The court observed:

> The presence of an officer within the curtilage of a residence does not automatically amount to an unconstitutional invasion of privacy. Rather, it must be determined under the facts of each case just how private the particular observation point actually was.

95 Wn.2d at 902. It later reiterated that "[w]hat is reasonable cannot be determined by a fixed formula. It must be based on the facts and circumstances of each case." 95 Wn.2d at 903 (citing *Ker v. California*, 374 U.S. 23, 33, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963)). I take this to mean that the *Seagull* factors do not create a litmus test for every open view observation. It is therefore inappropriate to seize upon one of the *Seagull* court's considerations in a fact-specific inquiry and conclude that its absence gives Rose a legitimate expectation of privacy in what could, without the aid of a flashlight, be seen by anyone on his front porch a few hours earlier.

The affidavit in support of the search warrant indicates that Deputy Dekofski was "summoned to" the landlord's house "[o]n 11/18/91 at approximately 1800 hours". The search warrant was issued a little over 3 hours later, sometime between 9 and 9:22 p.m. Nothing in the record indicates exactly when the deputy went on to the front porch, but it was not unusually late in the evening. Since he was able to see the water and power lines going to the shed, it could not have been too long after dusk. Had the officer used a flashlight to look in the window in the middle of the night when no one would be expecting visitors, we might have a different case because that might exceed the "license to intrude" afforded a "reasonably respectful citizen". *Seagull*, 95 Wn.2d at 902. However, it is certainly not unusual to have visitors between 6 and 9 p.m. Thus, the majority's analysis must rest on Deputy Dekofski's use of a flashlight.

I cannot agree with the majority's conclusions that, standing alone, the use of a flashlight from a lawful vantage point constitutes "a particularly intrusive method of viewing", *Seagull*, 95 Wn.2d at 903, in light of the fact that the use of binoculars has been approved in other cases.

Furthermore, no case either the majority or I have found has held on facts even remotely similar to these that using a flashlight to "pierce the nighttime darkness" under circumstances where there would be no legitimate expectation of privacy during the daylight hours takes an officer's actions

out of the open view doctrine and converts them into a search. I would decline to do so and would reverse the trial court and remand the case for trial.

Review granted at 125 Wn.2d 1015 (1995).