[Nos. 33502-2-I; 34080-8-I.  Division One.  February 27, 1995.]

BETTI CRANWELL, *Appellant*, v. ROSE MESEC,
ET AL, *Respondents*.

JOHN MARIO PERANZI, *Appellant*, v. THE CITY OF
SEATTLE, ET AL, *Respondents*.

*Eric R. Stahlfeld* and *Richard B. Sanders,* for appellants.

*Mark H. Sidran, City Attorney,* and *Bruce Conrad Hori, Assistant,* for respondent Seattle.

PEKELIS, C.J. — Betti Cranwell (Cranwell) and John Mario Peranzi (Peranzi), owners of Seattle apartment buildings, appeal from orders granting summary judgment to the City of Seattle (the City). On appeal, Cranwell and Peranzi primarily challenge two aspects of the City's Residential Housing Inspection Program (RHIP): (1) the constitutionality of the City's inspections of their buildings and (2) the constitutionality of the City's notice of violation process. Because both appeals were linked for the purposes of oral argument and involve many of the same issues, we find it is appropriate to resolve them in a single opinion. As a result, we hereby consolidate these appeals under cause 33502-2-I pursuant to RAP 3.3(b).

## FACTS

### THE RESIDENTIAL HOUSING INSPECTION PROGRAM AND THE NOTICE OF VIOLATION PROCESS

The RHIP, which is administered by the City's Department of Construction and Land Use (DCLU), is a preventa-

tive inspection program which targets certain predetermined rental housing buildings at risk for serious housing and building maintenance code violations (code violations).[1]

As authority to inspect individual tenant units and common areas of targeted buildings, the City primarily relies upon tenant consent. To obtain tenant consent, the City sends an informational packet to each tenant, which includes a letter explaining the RHIP and a self-addressed, postage-prepaid postcard to be returned to the DCLU. If the tenant agrees to the inspection, he or she checks a box on the postcard next to the statement:

> I agree to allow DCLU inspectors to enter my unit to inspect for violations of the House and Building Maintenance Code on the scheduled date. (If more than one date is identified in attached letter please specify your choice.)

If the tenant refuses, he or she checks a box on the postcard next to the statement, "I do not want my unit inspected". If the tenant returns the postcard and indicates consent to inspect, a RHIP inspector contacts the tenant to arrange a convenient inspection time.[2] DCLU also sends notices about the RHIP to owners.

If an inspection reveals code violations, the DCLU sends a notice of violation (NOV) to the building's owner identifying the violation(s), the corrective action needed, and the deadline for compliance. Seattle Municipal Code (SMC) 22.206.220(A). To obtain review of a NOV, an affected party, such as an owner, must request review in writing within 10 days of service of the notice. SMC 22.206.230(A). SMC 22.206.230(B) provides:

> The review will consist of an informal review meeting held at the Department. A representative of the Director who is familiar with the case and the applicable ordinances will attend. The Director's representative shall explain the reasons for the issuance of the notice of violation and will consider any information

---

[1]For a complete history of the RHIP and the City's efforts to enforce its building and housing codes, see Seattle v. McCready, 123 Wn.2d 260, 263-65, 868 P.2d 134 (1994) (hereinafter McCready I).

[2]According to the City, the DCLU takes no further action on the unit if the postcard is not returned.

presented by the persons attending. At or after the review, the Director shall:

1. Sustain the notice of violation; or
2. Withdraw the notice of violation; or
3. Continue the review to a future date; or
4. Amend the notice of violation. . . .

If review is not sought in compliance with SMC 22.206.230(B), the NOV becomes the final decision of the Director. SMC 22.206.220(J). The City is then required to file a copy of the NOV with the King County Department of Records and Elections. SMC 22.206.220(J). According to Robert J. Laird (Laird), DCLU code compliance coordinator, the NOV filing "does not create a monetary encumbrance on the property, but it does give notice to interested parties and prospective purchasers of alleged code violations on the property".

Any failure to comply with the NOV constitutes a code violation. SMC 22.206.270. A $15 per day cumulative civil penalty is imposed for each housing unit, common area, or other building area in violation.[3] SMC 22.206.280. To collect the civil penalty, "[t]he City Attorney shall, with the assistance of the [DCLU] Director, take appropriate action." SMC 22.206.280(F). SMC 22.206.280(G) provides:

> G. The violator may show, in mitigation of liability, that correction of the violation was commenced promptly upon receipt of notice, but that compliance within the time specified was prevented by an inability to obtain necessary materials or labor, inability to gain access to the subject building, or other condition or circumstance beyond the control of the violator, and upon a showing of the above described conditions, the court may enter judgment for less than the maximum penalty.

According to Laird, these provisions give the property owner the right to challenge the validity of the alleged code violations at the municipal court hearing to enforce the NOV. Laird contends that "the defendant is accorded a full trial on the merits and the City has the burden of production and must prove its case by a preponderance of the evidence."

---

[3]A person is subject to criminal penalties if: (1) he or she has had a prior civil judgment under SMC 22.206.260 during the past 5 years or (2) there is a pattern of willful, intentional, or bad faith refusal to comply with the code. SMC 22.206 .290(B)(2), (3).

He further contends that the:

> Seattle Municipal Court requires proof of alleged ordinance violations listed in the Notice of Violation and/or Order of the Director as well as the number of days the property has been out of compliance before any penalties are imposed by the court, and a judgment is entered. *Only after a judgment is obtained and it is filed with King County is there a monetary encumbrance on the property.*

(Italics ours.)

### Facts of *Cranwell v. Mesec*

Cranwell owns an apartment building (the building) located at 105 Mercer Street. On April 5, 1991, the DCLU sent Cranwell a letter requesting to inspect the building and inviting her to a private forum for property owners to discuss the RHIP.[4] On April 16, 1991, Cranwell's building property manager sent the following letter to the DCLU:

> [W]e deny your request for consent. As agent for the owner of the building, we demand you serve us with any application for a warrant to inspect the building at least 20 days prior to submittal of that application. . . .[5]

On April 22, 1991, the DCLU sent Cranwell another letter requesting to inspect the building and informing her that May 9 and 10, 1991, had been designated as the inspection dates. The letter stated that the DCLU would arrange convenient inspection times with the tenants.

The DCLU then sent Cranwell's tenants the RHIP information packets by which it sought consent to inspect their units via the postcards. Twenty-three (23) tenants returned signed postcards to DCLU; 10 tenants checked the box indicating their consent to an inspection.

On May 9, 1991, Rose Mesec (Mesec), a former RHIP inspector, inspected four units, 113, 209, 211, and 313, for

---

[4]Cranwell's assertion that the DCLU "demanded a warrantless search" of her building is not borne out by the record. The DCLU's letter stated, "We would like to inspect your . . . building. . . ."

[5]The City contends that there is no evidence that it received this letter, claiming that it was sent to an old address. However, the record indicates that the letter was sent to the address provided in the DCLU's April 5, 1991, letter to Cranwell.

which tenant consent had been given. The tenant of unit 113 allowed Mesec into the building. On her way to the unit, Mesec examined the front entry area and the condition of the hallways. After inspecting unit 113, the tenant brought Mesec to the laundry room, which she also inspected. According to Mesec, the inspection revealed "numerous housing code violations".

On May 10, 1991, Mesec returned to complete the scheduled inspections. Before the tenant of unit 201 could admit her, a person, whom she believed to be the building manager, barred her entry by physically pushing her and stating, "The management company does not want you in the building and I will not let you in." On May 29, 1991, the City inspected unit 102 pursuant to tenant consent from a returned postcard. This inspection also revealed code violations.

To gain access to the units of the remaining consenting tenants, the DCLU applied ex parte to the municipal court for an administrative search warrant. Cranwell was not notified of the search warrant application. In support of its application, the City relied upon the violations found during the May 9 inspection. Finding that "probable cause exist[ed] for the issuance of said warrant", the court issued an inspection warrant for the remaining units for which tenant consent had been given previously. Mesec then inspected units 302 and 314, which also revealed numerous housing code violations.

On June 19, 1991, the DCLU issued a NOV to Cranwell, which was based on violations discovered during the three inspections.[6] The NOV stated that all violations must be corrected by August 19, 1991. The NOV also stated:

> The Housing and Building Maintenance Code provides that anyone affected by a Notice of Violation may request a review of this Notice before a Department Review Officer.

The NOV set out the procedure for seeking a review of the NOV, which, according to the City, Cranwell did not seek. As

---

[6]DCLU issued Cranwell a second NOV, but later released it after determining that it had been issued in error.

a result, the NOV became final and was filed with the King County Department of Records and Elections on July 9, 1991.[7]

### Facts of *Peranzi v. City of Seattle*

Peranzi owns an apartment building (the building) located at 7914 Densmore Avenue North. On June 13, 1991, the DCLU sent Peranzi a letter requesting permission to inspect the building. Peranzi sent a written reply refusing to consent to an inspection. The DCLU then sent postcards to Peranzi's tenants requesting consent to an inspection. None of the tenants returned the postcards. However, tenant Bruce McDonald (McDonald) later contacted the City to request an inspection.

When RHIP inspector Carlee Casey (Casey) met with McDonald on July 26, 1991, she first inspected his individual unit and then, with his permission, inspected the building's common areas. During Casey's inspection, Peranzi arrived and asked her to discontinue the inspection, which she did shortly thereafter.

On August 12, 1991, another tenant, Kevin Lederman (Lederman), contacted the City to request an inspection. On August 26, 1991, Casey inspected his unit. Lederman also permitted Casey to inspect the laundry room and the water heater room.

Casey's inspections revealed several code violations. On September 3, 1991, the DCLU issued a NOV to Peranzi, which was based on the violations discovered in these inspections. The NOV stated that Peranzi must correct all violations by October 3, 1991.

During her first inspection, Casey noted that the common areas were under construction. Because the City's records showed that Peranzi had not applied for a construction permit, Casey referred the matter to the DCLU construction inspection division. On September 10, 1991, Lane Youngblood (Youngblood), a construction inspection division inspec-

---

[7]According to the City, it has not, as yet, filed a penalties action against Cranwell.

tor, went to inspect the building. Upon arriving, Young-blood buzzed several units via the intercom system until a tenant responded. Youngblood identified himself as a city inspector and requested permission to inspect the common areas. The tenant consented and permitted Youngblood to inspect the laundry room where he discovered code viola-tions. As a result, the City issued a second NOV to Peranzi.

On that same day, Peranzi requested that the DCLU review the first NOV.[8] Peranzi arrived at the review hearing accompanied by his attorney and a court reporter. Peranzi wanted the court reporter to provide a verbatim transcript and to swear in witnesses. When a DCLU representative informed Peranzi that the court reporter would not be al-lowed at the hearing, Peranzi refused to continue. Subse-quently, the DCLU offered Peranzi two more opportunities for a hearing without a court reporter. When Peranzi failed to avail himself of these offers, the DCLU informed him that the NOV had become final. However, the City did not file either NOV with the King County Department of Records and Elections nor has it filed a penalties action against Per-anzi.[9]

### Procedural History of Both Actions

Cranwell and Peranzi filed separate actions in which they sought, *inter alia*, a declaration that the inspections were invalid, injunctive relief, a writ of review to challenge the validity of the NOV, and damages and attorney's fees under 42 U.S.C. § 1983 and § 1988. In their complaints, Cranwell and Peranzi contended that the City's inspections of their buildings and the City's NOV process violated their consti-tutional rights.

The trial court denied Cranwell's and Peranzi's petitions for a statutory or constitutional writ of review of the NOV.

---

[8]Apparently, Peranzi never sought review of the second NOV.

[9]We grant the City's motion to strike footnote 2 on page 6 of Peranzi's reply brief, which discusses the consequences of the City's filing of Cranwell's NOV. Under RAP 10.3(a)(4), we are precluded from considering these facts on appeal because the status of the NOV issued to Cranwell was not before the trial court in Peranzi's case.

Each sought discretionary review of the rulings with this court, which this court then consolidated. In denying the motions for discretionary review, a commissioner of this court ruled that the trial court's denial of the issuance of a writ of review was not erroneous because a plain, speedy, and adequate remedy at law was available. Specifically, the commissioner relied upon the fact that, in the underlying actions, Cranwell and Peranzi sought declarations that the City's inspections were unconstitutional, injunctions to prevent the enforcement of the NOV's, and the suppression of all evidence gained from the inspections. The commissioner reasoned, "If Peranzi and Cranwell succeed, they will obtain essentially the same relief they might have obtained through a writ procedure."

In both cases, the City moved for summary judgment, arguing that the RHIP inspections did not violate Cranwell's or Peranzi's constitutional rights against warrantless searches and that the City's NOV process does not violate procedural due process. Cranwell and Peranzi brought cross motions for partial summary judgment. The trial court granted summary judgment to the City in both cases and dismissed Cranwell's action.

Before dismissing Peranzi's action, however, the trial court determined that, although the tenant had consented to the search of the water heater room, a genuine issue of material fact existed as to whether the room constituted a common area or whether the room was under the landlord's sole control. Following a trial on the issue, the trial court found that the door to the room was usually left unlocked and occasionally left open. It also found that Lederman had described the contents of the room to Casey prior to the inspection. Based on these facts, the trial court concluded that the water heater room was not a common area, but that Casey reasonably believed that it was one. Therefore, it concluded that Lederman had apparent authority to consent to an inspection of the water heater room.

Cranwell and Peranzi then sought direct review with the Washington Supreme Court, which was denied. After the

cases were transferred to this court, they were linked for a hearing on the merits and then consolidated for the purposes of this opinion.

DISCUSSION

I

VALIDITY OF INSPECTIONS OF INDIVIDUAL TENANT UNITS AND COMMON AREAS

In contending that the trial court erred in granting summary judgment to the City, Cranwell and Peranzi challenge the validity of the City's inspections of their buildings on multiple bases, each of which will be addressed in turn.

A. Tenant Consent to Inspections of Individual Tenant Units

Cranwell and Peranzi first contend that the City violated both their federal and state constitutional rights when it inspected the tenants' individual apartment units. It is Cranwell and Peranzi's position that tenants lack authority to consent to such inspections.

■ However, the Washington Supreme Court rejected this argument in *Seattle v. McCready*, 124 Wn.2d 300, 877 P.2d 686 (1994) (hereinafter *McCready* II), in which it held that the tenant, not the landlord, has the privacy interest in an individual apartment unit. Therefore, the court concluded that it is the tenant who possesses the authority to consent to an inspection of his or her own unit, "notwithstanding any objections by their landlords". *McCready* II, at 306. Based on *McCready* II, it is clear that the City could constitutionally rely on tenant consent to inspect the tenants' individual units.

Cranwell, however, contends that even if tenants have authority to consent to an inspection of their units, the City has failed to prove by admissible evidence that the tenants voluntarily consented to the May 9 and May 29 inspections.[10] Cranwell argues that the returned postcards, which

---

[10]Peranzi also contends that the City has not proven that his tenants consented. However, the City inspectors have declared that they received tenant consent for each inspection. Peranzi offers no evidence to dispute this proof. His naked assertion that a factual question exists regarding consent is not sufficient

the City primarily relies on as evidence of tenant consent, constitute impermissible hearsay.[11]

■ "Hearsay" is defined as

a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

ER 801(c). In determining whether a statement is hearsay, Robert H. Aronson explains:

If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and that statement is not hearsay. . . .

Robert H. Aronson, *The Law of Evidence in Washington* 801-5 (Supp. 1989).

The City is correct that the statements are not offered for the truth of the matter asserted, *i.e.*, that the tenants voluntarily consented. Rather, they are offered as proof that the statements were made, which is in itself significant to the ultimate factual determination of whether the City was permitted to conclude that the tenants had consented to an inspection of their units.

Cranwell next contends that a genuine issue of material fact exists as to whether the tenants voluntarily consented to an inspection of their units. It is her position that the statements contained in the postcards are insufficient to prove voluntary consent. She argues that the statements only "establish acquiescence or nonresistance" to the City's inspection request.

■ Whether the tenants voluntarily consented to the inspections is a question of fact to be determined from the totality of the circumstances.[12] *See Schneckloth v. Bustamonte*, 412

to oppose a motion for summary judgment. *Jacobsen v. State*, 89 Wn.2d 104, 111, 569 P.2d 1152 (1977).

[11]Cranwell objects to the following statement: "I agree to allow DCLU inspectors to enter my unit to inspect for violations of the Housing and Building Maintenance Code on the scheduled date. (If more than one date is identified in attached letter please specify your choice.)"

[12]We reject the City's assertion that the interpretation of the statements is a legal determination, rather than a factual determination, because the postcards

U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973). In *E.Z. v. Coler*, 603 F. Supp. 1546, 1556 (N.D. Ill. 1985), *aff'd*, 801 F.2d 893 (7th Cir. 1986), the court explained:

> [*T*]*he standards for consent to an administrative search are less stringent than the standards for consent to a criminal search.* For example, in *United States v. Thriftimart, Inc.*, 429 F.2d 1006 (9th Cir.), *cert. denied*, 400 U.S. 926, 91 S. Ct. 188, 27 L.Ed.2d 185 (1970), consent to search a warehouse was found valid even though the consenting warehouse managers were not warned that they had a right to refuse entry. The Court traced the history of the consent doctrine in administrative searches and found that, absent coercion, knowledge of the right to refuse entry was not required. Later, even in the context of a criminal search, the Supreme Court found that the voluntariness of consent cannot be judged merely by the fact that a person does not have knowledge of his or her right to refuse entry. *Schneckloth*, 412 U.S. 218. . . . *Consent must be judged by the totality of the circumstances* and lack of knowledge of the right to refuse a search cannot, standing alone, invalidate consent. *Id. In the administrative search context, courts have taken into account a number of factors, including whether there is evidence of intimidation, coercion or misrepresentation.*

(Citation omitted. Italics ours.)

Cranwell attempts to analogize this case to *State v. Browning*, 67 Wn. App. 93, 834 P.2d 84 (1992) (Agid, J., concurring), which also involved an administrative search. However, the following safeguards present in this case distinguish it from *Browning* and support the finding that the tenants did not merely acquiesce to the City's request to inspect: (1) the postcards explicitly gave the tenants *the option* to consent to or refuse the City's inspection request;[13] (2) the City made its request to inspect via the mail, rather than in person; and (3) those tenants who indicated their consent on the postcards were then contacted by a DCLU employee for the purpose of arranging a convenient time for

___

are written instruments. The fact that the tenants indicated their consent by way of the postcards is just one circumstance bearing upon the ultimate factual determination of whether the tenants voluntarily consented to the inspections.

[13]Significantly, 13 of the 23 tenants who returned the postcards *refused* to consent to an inspection, further evidencing a lack of coercion by the City.

the inspection, thereby giving the tenants another opportunity to refuse consent.

■ Based on the foregoing, it is clear that Cranwell has failed to identify any fact which would support the conclusion that the tenants merely acquiesced to the DCLU's request to inspect their units. As previously noted, "[a] naked assertion of unresolved factual questions is not sufficient to oppose a motion for summary judgment." *Jacobsen v. State*, 89 Wn.2d 104, 111, 569 P.2d 1152 (1977). Thus, under either the administrative search consent standard or the criminal search consent standard, we conclude that Cranwell raises no genuine issue of material fact as to whether her tenants freely and voluntarily consented to an inspection of their units.[14]

B. Tenant Consent to Inspections of the Common Areas

Peranzi and Cranwell next contend that the City violated their rights under article 1, section 7 of the Washington Constitution when it inspected the common areas of their buildings. It is Cranwell and Peranzi's position that tenants lack authority to consent to common area inspections.

■ Again, the Washington Supreme Court rejected this argument in *McCready* II. In order for third parties, such as tenants, to consent to a search, they must share common authority over the property. *McCready* II, 124 Wn.2d at 306.

---

[14]We reject Cranwell's contention that, even if tenant consent had been voluntarily given, the investigations exceeded the scope of consent. In light of our holding, *infra*, that tenants possess authority to consent to common area inspections notwithstanding the landlord's prior objection, it is immaterial whether the City's inspections exceeded the scope of the tenants' original consent.

We also reject Cranwell's assertion that the City exceeded the scope of consent by not conducting all of the inspections on May 9 and 10, as specified in the DCLU's letter. Before inspecting a unit for which tenant consent has been given, DCLU arranges a convenient time with the tenants. Apparently, May 29, 1991, was convenient for the tenant of unit 102. Moreover, the inspections scheduled for May 10 could not be conducted because Cranwell's agent refused to admit the inspector into the building. As a result, Cranwell cannot complain that the inspections did not take place on the scheduled date.

We also reject Cranwell's attempt to raise an issue of fact as to whether voluntary consent was given because the City has failed to prove whose writing appears on the face of the postcards. This issue is irrelevant in light of the City's practice of confirming each tenant's consent by contacting them to arrange a convenient inspection time.

Third parties have common authority if (1) they would be able to permit a search in their own right and (2) it would be reasonable to find that the target of the search has assumed the risk that others might permit a search. *McCready* II, at 307 (citing *State v. Mathe*, 102 Wn.2d 537, 543-44, 688 P.2d 859 (1984)). Applying the *Mathe* test, the court concluded that tenants have the requisite common authority over the common areas to consent to a search. *McCready* II, at 307.

However, Cranwell and Peranzi argue that, even if landlords and tenants each can consent to common area inspections, a tenant's consent cannot override the landlord's prior objection. In these cases, the City relied upon tenant consent to inspect the common areas even though both Cranwell and Peranzi had refused the City consent in writing. As support for their argument, they cite *State v. Leach*, 113 Wn.2d 735, 744, 782 P.2d 1035 (1989), in which the court held that if a criminal suspect is present and able to object, the police cannot constitutionally rely on a co-occupant's consent to search his or her residence.

We conclude that *Leach* is inapplicable to this situation. First, a significant difference exists between the type of property at issue in *Leach*, the defendant's personal residence, and the type of property at issue here, the common areas of rental housing buildings. Landlords simply do not have the same expectation of privacy in the common areas of rental housing buildings as co-occupants have in their own residences. Specifically, co-occupants in a residence often share familial or other social ties which foster a sense of privacy regarding their shared living space, while the landlord-tenant relationship is typically a commercial affiliation between strangers.

For the tenants, common areas (which include amenities such as laundry rooms and lounges) are extensions of their living space. For the landlords, the common areas are commercial spaces quite separate from their own abodes. In general, landlords enter common areas only to inspect and maintain them for their tenants' benefit. Given their commercial relationship to the building, it is clear that landlords

do not develop an expectation of privacy in the common areas.[15]

Landlords' minimal expectation of privacy in the common areas makes it unreasonable to allow them to veto a tenant's consent to an inspection. *See State v. Cantrell*, 124 Wn.2d 183, 191, 875 P.2d 1208 (1994) (holding that a lowered expectation of privacy limits the relative rights of co-occupants to prevent a search of common areas).

Second, *Leach* is distinguishable because a criminal search has greater constitutional implications than the health and safety inspections at issue here. "[A] routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime." *Camara v. Municipal Court*, 387 U.S. 523, 530, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). Hence, in this context, a landlord's interest in overriding a tenant's consent simply is not as compelling as a potential criminal defendant's interest in overriding a co-occupant's consent to search.

Conversely, in an administrative search, such as this, a tenant's interest in overriding a landlord's objection is more compelling than a co-occupant's interest in overriding a potential criminal defendant's objection. The RHIP inspections are designed to ensure that rental housing buildings are safe and inhabitable. Because typically it is the tenants who reside in these buildings, not the landlords, the tenants' interest in allowing a health and safety inspection is far superior to the landlords' interest in refusing consent.

---

[15]The Residential Landlord-Tenant Act of 1973 reflects society's expectation that rental properties are commercial ventures that will not be treated as landlords' private sanctuaries. RCW 59.18. The act regulates almost every aspect of the landlord-tenant relationship. Significantly, it provides that when an inspection is deemed necessary to ensure the health and safety of the tenants, "[t]he landlord shall have no power or authority to prohibit entry for the inspection." RCW 59.18.115(2)(c). Given this legislative mandate, it is evident that a landlord's expectation of privacy in the common areas is minimal compared to a co-occupant's interest in a home.

Based on this analysis, we conclude that it would be unreasonable to allow landlords to preempt tenant consent to common area inspections. Because Cranwell and Peranzi's written refusals of consent did not override their tenants' subsequent consent, the City's inspections of the common areas of their building did not violate the Washington Constitution.[16]

■ Peranzi next contends that his tenant, Lederman, had no authority to consent to the water heater room inspection because it was not a common area. The trial court found that the City inspector reasonably believed that the water heater room was a common area and thereby concluded that the search was lawful under the doctrine of apparent authority. "Apparent authority upholds an officer's *reasonable* belief of common authority to validate an entry whether or not the authority in fact existed." *State v. Rose*, 75 Wn. App. 28, 34, 876 P.2d 925, 929 (1994) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 187-89, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990)).[17]

■■ It is Peranzi's position, however, that the trial court erred because the inspector lacked sufficient information from which she could have reasonably concluded that the water heater room was a common area. As support, he cites *United States v. Whitfield*, 939 F.2d 1071, 1074-75 (D.C. Cir. 1991), in which the court determined whether, as a factual

---

[16]Cranwell and Peranzi also contend that the City violated their Fourth Amendment rights when it inspected the common areas of their buildings. Again, we disagree. Most of the federal circuits have adopted a per se rule that one co-occupant's objection to a search does not invalidate another co-occupant's subsequent consent. *See, e.g., United States v. Sumlin*, 567 F.2d 684, 688 (6th Cir. 1977), *cert. denied*, 435 U.S. 932 (1978); *United States v. Hendrix*, 595 F.2d 883, 885 (D.C. Cir. 1979). The Ninth Circuit, while recognizing a co-occupant's right to oppose a search in some instances, holds that when both parties have equal access to the common areas, the objection of one co-occupant does *not* negate the consent of the other. *United States v. Sealey*, 630 F. Supp. 801, 809 (E.D. Cal. 1986), *aff'd on other grounds*, 830 F.2d 1028 (1987).

[17]The cases addressing apparent authority do not directly address the applicability of the Washington Constitution. *See, e.g., State v. Rose*, 75 Wn. App. 28, 34-35, 876 P.2d 925, 929-30 (1994). In this regard, Const. art. 1, § 7 is apparently comparable to the Fourth Amendment and, therefore, we draw no distinction between them here.

matter, officers could reasonably believe that a mother had authority to consent to a search of her adult son's bedroom. The *Whitfield* court found that the mere fact that the son's room was part of his mother's house was insufficient to support a finding that the mother shared common authority over the room. Significantly, the court noted that common authority cannot be inferred from a mere property interest, but must be based on proof of mutual use. *Whitfield*, at 1075.

The area at issue in *Whitfield* is clearly distinguishable from the area at issue here. Peranzi has not assigned error to the following findings which are therefore verities on appeal: (1) the water heater room door had been left unlocked frequently; (2) the water heater room door had been left open occasionally; and (3) Lederman, the tenant, described the room's contents to the City inspector. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

Lederman's familiarity with the contents of the room was sufficient evidence from which Casey could reasonably conclude that the tenants had use of the room. Casey's determination is also supported by the fact that the door had been left unlocked and open. It would be unusual for a landlord to frequently leave such a room unlocked unless it was an area to be used by tenants. Thus, the trial court did not err in finding that Casey reasonably believed that the water heater room was an area over which Lederman had common authority and hence, in concluding that the water heater room inspection was constitutional.

## II

### INSPECTIONS CONDUCTED PURSUANT TO AN ADMINISTRATIVE SEARCH WARRANT AND TENANT CONSENT

Cranwell next contends that the municipal court lacked authority to issue the administrative search warrant, which authorized inspections of those units for which tenant consent had been given previously, and therefore the warrant must be quashed.

In *McCready* II, 124 Wn.2d at 310, the court held that the municipal court is without authority to issue administrative search warrants supported by probable cause *unless* the inspection warrant application alleges a code violation which constitutes a *crime*, rather then a civil infraction.[18]

Although the warrant application in this case did not allege a criminal penalty on its face, the administrative search warrant was obtained only because Cranwell's agent denied the City inspector entry to conduct the inspections of those units for which valid tenant consent had been given. Because valid tenant consent independently supported the inspections in this case, the administrative warrant was unnecessary.[19]

## III

### PROCEDURAL DUE PROCESS CHALLENGE
### TO THE NOV PROCESS

Cranwell and Peranzi contend that the City's NOV process contravenes the Fourteenth Amendment's due process guaranty. Specifically, Cranwell and Peranzi challenge the City's failure to provide for a review hearing *before* the NOV is issued and filed.

As the court in *Arnold v. Department of Retirement Sys.*, 74 Wn. App. 654, 666-67, 875 P.2d 665 (1994) explained:

> "Where any 'significant property interest' is at stake the safeguards of procedural due process are applicable." *Olympic Forest Prods., Inc. v. Chaussee Corp.*, 82 Wn.2d 418, 428, 511 P.2d 1002 (1973). Procedural due process prevents the government from taking a person's property or liberty without providing that party notice and an opportunity to be heard. *Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 224, 829 P.2d 1099 (1992).

Once procedural due process protections apply, some type of predeprivation hearing is required unless extraordinary circumstances exist. *Tellevik v. Real Property*, 120 Wn.2d 68, 82, 838 P.2d 111 (1992). The formality of the predeprivation

---

[18]We reject Cranwell's contention that administrative search warrants cannot be issued ex parte. *See McCready* II, 124 Wn.2d at 311.

[19]Given our disposition of this issue, we need not address the City's contention that the Seattle Municipal Court is immune from a 42 U.S.C. § 1983 suit.

hearing is determined according to an analysis of the three factors enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). *Tellevik*, at 82.

In *Connecticut v. Doehr*, 501 U.S. 1, 12, 115 L. Ed. 2d 1, 111 S. Ct. 2105, 2113 (1991), the case upon which Cranwell and Peranzi rely, the Supreme Court held that due process protections apply to "even the temporary or partial impairments to property rights" such as attachments, liens, and "similar encumbrances".[20] In concluding that an attachment lien deprived a real property owner of a significant property interest, the court relied on the fact that an attachment ordinarily clouds title, damages any credit rating, and impairs the ability to mortgage and alienate property. *Doehr*, 501 U.S. at 12.

Cranwell and Peranzi argue that *the issuance and filing of the NOV* constitute a "significant property interest" giving rise to procedural due process safeguards.[21] In so arguing, Cranwell and Peranzi analogize the filing of the NOV to the filing of a lis pendens notice, which, they argue, constitutes a significant property interest giving rise to due process protections.[22]

Although we accept the analogy, we are persuaded by those authorities holding that the filing of a lis pendens notice does not constitute a significant property interest. For instance, in *Debral Realty, Inc. v. DiChiara*, 383 Mass. 559,

---

[20]An "encumbrance" is a "claim, lien, charge, or liability attached to and binding real property; *e.g.*, a mortgage; judgment lien; mechanics' lien; lease; security interest; easement or right of way; accrued and unpaid taxes." Black's Law Dictionary 527 (6th ed. 1990).

[21]Cranwell and Peranzi have not specifically argued that, after the NOV becomes final, the risk of accruing cumulative daily penalties for noncompliance with the NOV constitutes a property deprivation giving rise to due process protections. Furthermore, to the extent such an argument is implied, they cite no relevant authority for such a proposition. Therefore, we do not address this potential issue here. RAP 10.3(5).

[22]The underlying purpose of a lis pendens is to give notice of pending litigation affecting the title to real property and to give notice that anyone who subsequently deals with the affected property will be bound by the outcome of the action to the same extent as if he or she were a party to the action. RCW 4.28.320; *R.O.I., Inc. v. Anderson*, 50 Wn. App. 459, 748 P.2d 1136 (1988).

564-66, 420 N.E.2d 343, 347-49 (1981) the court held that the filing of a lis pendens notice without notice and an opportunity to be heard does not violate procedural due process. *See also Batey v. Digirolamo*, 418 F. Supp. 695, 697 (D. Haw. 1976). The *Debral Realty* court reasoned, *inter alia*, that:

> Although we acknowledge the substantial economic effects that can result from the filing a lis pendens notice (effects that mirror those resulting from the use of a real estate attachment), we do not think that these effects constitute a significant enough deprivation by the *State* so as to require that the landowner be given an opportunity to be heard in advance of filing.

*Debral Realty*, at 565. The court also stated:

> We stress that the landowner is not *prohibited* from alienating or encumbering the property subject to lis pendens. Although alienation may be more difficult, there is nothing to prevent the sale if the landowner can find a willing buyer.

*Debral Realty*, at 364 n.9. The court further reasoned that the State's role in filing the lis pendens is far less than its role in effectuating a prejudgment seizure or attachment. *Debral Realty*, at 566.

Moreover, this court's decision in *Pay 'N Save Corp. v. Eads*, 53 Wn. App. 443, 447-48, 767 P.2d 592 (1989) is in accord with the view espoused in *Debral Realty* — that the filing of a lis pendens notice does not constitute a deprivation of property. At issue in *Eads* was whether the filing of the lis pendens notice fulfilled the "injury or damage" element of malicious prosecution, which requires an allegation and proof that the plaintiff's property was seized. *Eads*, at 447. In holding that the filing of a lis pendens does not constitute a seizure of property, the court quoted approvingly from *Blumenfeld v. R.M. Shoemaker Co.*, 286 Pa. Super. 540, 546, 429 A.2d 654, 657-58 (1981):

> [A]lthough a lis pendens may temporarily cloud someone's title and therefore make encumbrancing or conveyancing difficult, it is nevertheless clear that *it does not even establish a lien upon the affected property. A fortiori*, a lis pendens does not constitute a seizure of property within the purview of the Eng-

lish rule. Consequently, appellees failed to establish a cause of action for either malicious use of process or abuse of process.

(Italics ours.) *Eads*, 53 Wn. App. at 448.

The NOV at issue here operates much like a lis pendens notice in that it gives notice of the alleged code violations to interested parties. We deem it significant that the NOV, like a lis pendens notice, does not in any way create a lien on the property. Although the NOV, like a lis pendens notice, may temporarily cloud title, it in no way prevents property owners from mortgaging or alienating their property. As a result, we conclude that the mere issuance and filing of the NOV is not the type of encumbrance that constitutes a significant property interest giving rise to procedural due process. Accordingly, we deny Cranwell's request for an equitable decree removing any cloud from her title caused by the filing of the NOV.[23]

## IV

### DENIAL OF THE PETITIONS FOR A WRIT OF REVIEW

Finally, Cranwell and Peranzi contend that the trial court erred in denying their motions for a writ of review to contest the issuance of the NOV. It is their position that the motions should have been granted, arguing that the NOV process does not provide adequate judicial review of the final NOV.

We need not reach this issue because our review of their motions for a writ of review and their complaints reveal that Cranwell and Peranzi have never challenged the code violations upon which the NOV's were based.[24] Significantly, their motions for a writ of review were based upon the same challenges to the constitutionality of the City's inspections and the City's NOV process that have been resolved in this

---

[23]Peranzi also contends that the City violated his right to due process by refusing to allow a court reporter at the NOV review hearing, which is held before the NOV becomes final. Because we find that the mere issuance and filing of the NOV does not constitute a property interest giving procedural due process protections, we need not review Peranzi's contention that the City's having barred the court reporter violated his constitutional rights.

[24]We note that neither Cranwell nor Peranzi has moved to file an amended complaint to challenge the merits of the NOV.

appeal of the underlying actions. Thus, the trial court did not err in denying their motions for a writ of review.

Affirmed.

COLEMAN, J., and SCHOLFIELD, J. Pro Tem., concur.

Review denied at 127 Wn.2d 1004 (1995).